**EQUAL EMPLOYMENT OPPOR-
TUNITY COMMISSION,
Plaintiff–Appellant,**

v.

**CLAY PRINTING COMPANY,
Defendant–Appellee.**

No. 91–2576.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 30, 1991.

Decided Feb. 5, 1992.

As Amended March 2, 1992.

Robert John Gregory, E.E.O.C., Washington, D.C., argued (Donald R. Livingston, Acting Gen. Counsel, Gwendolyn Young Reams, Associate Gen. Counsel, Lorraine C. Davis, Asst. Gen. Counsel, on brief), for plaintiff-appellant.

John Robbins Wester, Robinson, Bradshaw & Hinson, P.A., Charlotte, N.C., argued (Mark W. Merritt, John B. Orgain, IV, on brief), for defendant-appellee.

Before RUSSELL and HAMILTON, Circuit Judges, and RESTANI, Judge, United States Court of International Trade, sitting by designation.

## OPINION

HAMILTON, Circuit Judge:

This is a civil enforcement action brought by the EEOC ("EEOC or Commission") under the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S. § 621, *et seq.* On May 18, 1990, the EEOC filed suit against Clay Printing Company ("Clay") for violations of the ADEA. The Commission sought individual relief on behalf of 23 claimants, five discharge claimants and 18 constructive discharge claimants. On appeal, the EEOC is pursuing the five discharge claims and four of the 18 constructive discharge claims. On April 19, 1991, the district court entered summary judgment for Clay on all claims and the EEOC appeals. Upon review of the record, we agree with the district court that the EEOC presented insufficient evidence to survive Clay's motion for summary judgment. Accordingly, the decision of the district court is affirmed.

### I

We review the district court's grant of summary judgment *de novo. Higgins v. E.I. DuPont De Nemours & Co.*, 863 F.2d 1162, 1167 (4th Cir.1988). For the purposes of summary judgment, we assume as true the facts alleged by the EEOC. *See Bishop v. Wood*, 426 U.S. 341, 347, 96 S.Ct. 2074, 2078, 48 L.Ed.2d 684 (1976).

Clay Printing is a family-owned business located in Hickory, North Carolina. For years, the company was owned and managed by J. Wesley "Buddy" Johnson. Following his death in 1985, control of the company passed to his widow, Nancy Johnson, who ceded the responsibility for the day-to-day operation of the business to other company officials.

In the fiscal years of 1986 and 1987, Clay continued to generate a profit. Indeed, in 1986, the company posted its largest profit in its history. Nancy Johnson, however, remained concerned about the company, especially over a growing inventory of paper and over the lackadaisical attitudes of some employees.

In July of 1987, Ms. Johnson sought advice from Ray L. Scott, a management consultant with experience in the printing business, and a friend of her late husband. Scott agreed to serve as a consultant. After extensive review of Clay's operations, Scott made observations and recommended detailed changes in Clay's operations. Those observations and recommendations included that:

1. The company appeared to be extremely overstaffed and inefficient; there were approximately 15 and maybe 20 employees too many at the current [sales] level;

2. Clay's management structure be reorganized;

3. The sales division's salary structure be converted to commission only;

4. The sales staff assume their own expenses;

5. Clay create a policy and procedure manual;

6. Clay implement a quality control procedure; and

7. Clay make employee evaluations to determine who was good, who was

hurting the company, and who was dead wood.

Clay's Board of Directors adopted many of Scott's recommendations. Beginning in the summer and fall of 1987, Clay began implementing Scott's proposed reorganization by terminating several of its employees. Scott became an integral part of the management hierarchy at Clay, and made frequent visits to the company. Scott ordered the terminations of some employees and participated in hiring and firing decisions made by the company. Scott inquired into early retirement for some employees, and in one of his initial visits to Clay, Scott remarked at a meeting with company officials that "too many people have been here too long and make too much money." Scott also indicated that "the company didn't have young blood in the company being crossed [sic] trained," and that "if employees had been there 10 years or more, they needed to move on."

The five discharge claimants in this case are Edna Brown, Richard Bowman, Roosevelt Whittington, Robert Herman, and Gary Houck. These individuals were terminated in the aftermath of Scott's reorganization initiative. Each discharge claimant received no formal reprimands or warnings prior to his or her termination. However, there was evidence proffered by Clay that the discharge claimants were terminated for cause.

Richard Bowman was terminated in February, 1989. Bowman was 58 at the time, and had nearly 40 years experience with Clay. At the time of discharge, he was Clay's only platemaker. Bowman had not received any written or oral reprimands regarding his work and, by several accounts, including his immediate supervisor (Robert Herman), was performing his job well. Bowman's position was filled by Steve Herman, a Clay employee, age 35. Sid Ballard, Clay's production manager, testified that Bowman was repeatedly in the break room when there was work to be done; made defective plates; would not fill out plate-remake reports; smoked over plates; and by his own admission, became confused and would not think straight.

Robert Herman was also terminated in February, 1989. Herman was 48 at the time, and had nearly 20 years of experience with Clay. At the time of discharge, Herman was Clay's prepress supervisor. There is evidence that no complaints or reprimands were directed at Herman. After termination, Herman's duties were assumed by Sid Ballard, Herman's supervisor, age 35. Ballard, however, testified that Herman had too many plate remakes in his department; that work in his department took too long; and that Herman never emphasized timeliness to his employees. Herman testified that Scott was critical of his department.

Roosevelt Whittington was terminated in October, 1987. He was 53 at the time, and had worked at Clay for over 25 years. At the time of discharge he was Clay's quality control supervisor, a position created by Clay pursuant to Scott's recommendations. Nobody filled Whittington's position after discharge. His old position, pressroom supervisor, was filled by Fred Lail, age 48.

In his initial recommendations to the Board, issued two months prior to Whittington's discharge, Scott described as "unfortunat[e]" the fact that Whittington had 25 years experience with Clay. When Ned Lutz informed Whittington that he was being terminated, Lutz indicated that he was discharged because he "ma[d]e more money on the floor than anybody else." Scott testified that Whittington was terminated because he spent excessive amounts of time in the break room and was failing to assure that Clay's employees followed policies and procedures on quality control.

Edna Brown was discharged in November, 1988. Brown was 60, and for several years worked as Clay's bookkeeper. In August, 1987, Brown was transferred to the comptroller position. In May, 1988, she was relieved of her duties as comptroller and given the job of personal assistant to Nancy Johnson. In Scott's report and recommendation, he described Brown as bright and intelligent.

When Brown was removed from the comptroller's position, she was replaced by Edward Sipes, age 46. At that time, Clay

had retained Sybil Howard, age 53, to perform the bookkeeping functions. A woman, whose age was unknown, was hired to assist Mrs. Johnson after Brown was terminated.

When Scott hired Sipes, who would ultimately replace Brown as comptroller, Scott indicated that Brown might leave through early retirement and that Sipes would replace her as comptroller. In May, 1988, Scott and Mrs. Johnson met with Brown and requested that she take early retirement. Brown refused. The following Monday, Brown was removed from her position as comptroller.

According to Sipes, Brown did not have the training to be a comptroller and could not prepare financial statements or profit and loss statements. With respect to her termination as Mrs. Johnson's aide, Johnson testified she lost confidence in Brown because she disclosed confidential information to other people and did not respect Mrs. Johnson's personal and private life.

Gary Houck was terminated in October, 1987. Houck was 40 at the time of discharge. He had worked 20 years at Clay, and never received any written complaint or reprimand. According to one supervisor, Houck was "one of the best platemakers he had ever been around." Houck was replaced by Bowman (age 56 or 57), who had moved into the platemaking department one year prior to Houck's discharge. Bowman was replaced 16 months later by Steve Herman, age 35. According to Ned Lutz, Clay's vice-president of operations, Houck was terminated for sleeping on the job.

Lutz, who was involved in employment decisions at Clay, testified that "if a person had been there a good while, they made a higher salary, and so the contention was that our people made too much money, and so they made too much money for what they were producing. So therefore age was involved in that." Lutz also indicated that additional job pressures were placed on "longer tenured employees" and that "younger" employees were provided salary increases at the expense of the employees that "had been there longer." However, Lutz's testimony was a little more specific. When asked whether Scott attempted to control things on account of age, Lutz testified that he did not. Sipes testified that another Clay official told him that Clay needed to restructure its benefit and compensation packages to "attract newer, younger people."

However, each discharged claimant testified that he (she) had no evidence to indicate that he (she) or any fellow employee was the victim of age discrimination. For example, each of these claimants testified that he (she) had not heard any statement to indicate that his (her) discharge was based on age. Likewise, each of these claimants testified that he (she) had not seen any document indicating that his (her) discharge was based on age. Finally, not one of the discharged claimants could identify any information or evidence that any other of the claimants, originally a part of this case, was the victim of age discrimination. Each claimant, however, expressed the personal belief or feeling that they were the victim of age discrimination. Their beliefs were based upon their own personal feelings without evidentiary support.[1]

Clay also provided statistical evidence in the form of an affidavit from its CEO, J. Wesley Johnson, III, indicating that from January 1987 through February 1991 more employees under age 40 left the employment of Clay than those departing employees over age 40. During the critical years of the alleged discrimination by Clay, the number of employees under age 40 and over age 40 who left the employment of Clay was about equal. In 1987, of the employees leaving the employment of Clay, six were under age 40, two were age 40, and four were over age 40; in 1988, eight were under age 40, one was age 40 and

---

1. At her deposition, Edna Brown testified that a letter dated September 27, 1987 from Scott to Brown was evidence of age discrimination. In that letter, Scott requested, among other things, a list of all employees, their starting date of employment, current pay, and the dates of their last three pay raises.

seven were over age 40; and, in 1989, thirteen were under age 40, two were age 40, and twelve were over age 40.

There are four constructive discharge claimants, Larry Linham, Larry Herman, Frank Childers and Tony Childers. These claimants all resigned following Scott's arrival. With the exception of Larry Linham, these individuals had worked in a sales position for years with Clay and resigned after Clay changed the terms and conditions of their employment.[2] At Scott's direction, Clay eliminated their annual base salaries, required them to pay their own expenses, took away their company cars, and demanded they (except for Linham) sign non-competitive agreements as a condition of their continued employment. During this period, Clay hired two sales representatives, James Mangum, who was under 40 and was "believed"[3] to be paid an annual salary; and Martha Scott Preddy Andrews, who was 50, placed on straight commission and provided a company car for five months.

Each of the constructive discharge claimants filed affidavits with the district court. Tony Childers' affidavit states that four months before he resigned from Clay, he had refused to sign a noncompetitive agreement. Linham's affidavit indicates that he left over a dispute about an employment contract. Frank Childers' affidavit indicated that he resigned in early 1989 and that he had some dispute with Clay over a non-competitive agreement. The EEOC submitted three affidavits on behalf of Larry Herman. In his second affidavit, Herman concluded that his "working conditions were intolerable." The only evidence offered by Herman in support of "intolerable working conditions" was that Clay placed him on commission and asked him to sign a non-competitive agreement.

The district court ruled against the EEOC on all claims. As to the discharge claims, the district court held that the EEOC failed to offer persuasive evidence that but for each discharge claimant's age the claimants would not have been discharged. As to the constructive discharge claims, the district court held that there was not a sufficient showing of deliberateness and intolerable working conditions to withstand Clay's motion for summary judgment.

## II

Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.Proc. 56(c). We must determine whether Clay has demonstrated "that there is an absence of evidence to support [each claimant's] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). We believe Clay has met this burden on all claims.

## A

In order to establish a cause of action under the ADEA, a plaintiff must demonstrate that but for the employer's motive to discriminate against the plaintiff on the basis of age, the plaintiff would not have been discharged. This can be established in one of two ways. The plaintiff may meet this burden under the ordinary standards of proof by direct or indirect evidence relevant to and sufficiently probative of the issue. In the alternative, a plaintiff may resort to the judicially created scheme established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and adapted to ADEA cases. *Lovelace v. Sherwin–Williams Co.*, 681 F.2d 230, 239 (4th Cir.1982); *Smith v. Flax*, 618 F.2d 1062, 1066 n. 3 (4th Cir.1980).

Under the ordinary standards of proof, the EEOC must demonstrate on behalf of

---

2. Linham was transferred to a sales position in August of 1987 from his previous position as plant manager. At the time of his transfer, he was informed that he would be paid on a commission only basis, and that as of the first of the year he would have to assume his own expenses.

3. *See infra* p. 945 and note 9.

each discharge claimant: (1) that he (she) was an employee covered by the Act, (2) who suffered an unfavorable action by an employer covered by the Act, and (3) that "age was a determining factor" in the action in the sense that " 'but for' " Clay's intent to discriminate on the basis of age, the claimant would not have been subjected to the employment action. *Spagnuolo v. Whirlpool Corp.*, 641 F.2d 1109, 1112 (4th Cir.), *cert. denied*, 454 U.S. 860, 102 S.Ct. 316, 70 L.Ed.2d 158 (1981) (citing *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1019 (1st Cir. 1979)). In overcoming a motion for summary judgment, the EEOC has to "produce direct evidence of a stated purpose to discriminate [on the basis of age] and/or circumstantial evidence of a stated purpose to discriminate [on the basis of age] of sufficient probative force to reflect a genuine issue of material fact." *Goldberg v. B. Green and Co., Inc.*, 836 F.2d 845, 848 (4th Cir.1988).

Alternatively, under the scheme espoused in *McDonnell Douglas*, the EEOC must demonstrate that each discharge claimant established a *prima facie* case. A *prima facie* case in a discharge claim consists of four elements. The claimant must demonstrate that: (1) he is a member of a protected class, (2) he was discharged, (3) at the time of discharge, he was performing at a satisfactory level, meeting his employer's legitimate expectations, and (4) following his discharge, he was replaced by a person outside the protected class. *EEOC v. Western Electric Co., Inc.*, 713 F.2d 1011, 1014 (4th Cir.1983); *Lovelace*, 681 F.2d 230, 239–41 (4th Cir.1982). In reduction-of-force cases, the fourth element may be satisfied by showing "that persons outside the protected class were retained in the same position or that there was some other evidence indicating that the employer did not treat age neutrally in deciding to dismiss the plaintiff." *Herold v. Hajoca Corp.*, 864 F.2d 317, 320 (4th Cir.), *cert. denied*, 490 U.S. 1107, 109 S.Ct. 3159, 104 L.Ed.2d 1022 (1988) (citing *Western Electric*, 713 F.2d at 1014–15).

Once the plaintiff has established a *prima facie* case under the ADEA, the "burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.' " *Burdine*, 450 U.S. at 252–53, 101 S.Ct. at 1093–94 (quoting *McDonnell Douglas*, 411 U.S. at 802–04, 93 S.Ct. at 1824–25). "The employer is not required to prove absence of a discriminatory motive, but merely articulate some legitimate reason for its action." *Western Electric Co.*, 713 F.2d at 1014 (citing *Smith v. University of North Carolina*, 632 F.2d 316, 332–33 (4th Cir. 1980)). It is simply a burden of production not of persuasion. If the defendant is successful in carrying this burden, the plaintiff must demonstrate by a preponderance of the evidence that defendant's reasons were a pretext for discrimination. *Burdine*, 450 U.S. at 252–53, 101 S.Ct. at 1093–94. On the pretext issue, each claimant must demonstrate by a preponderance of the evidence that Clay's decision to terminate the claimant was based upon age or simply "unworthy of credence." *Id.* at 256, 101 S.Ct. at 1095. The burden of persuasion remains with the plaintiff throughout. *Id.*

■ Under the ordinary standards of proof, the EEOC has failed, as the district court noted, to marshall enough evidence evincing age discrimination. Unquestionably, when a plaintiff admits under oath that he or she cannot point to any statement or piece of physical evidence indicative of age discrimination, it undermines the plaintiff's claim that but for age the employment decision would not have been made. This is not to suggest that such an admission at deposition would always preclude recovery. But in this case there is much more than each discharge claimant's admission under oath that he (she) could not identify any statement or evidence of age discrimination in any of Clay's employment decisions. The limited statistical evidence suggests anything but a youth movement at Clay. The alleged discriminatory statements were not directly related to any particular person, employment decision or pattern of decisionmaking.

At his deposition, Lutz testified:

if a person had been there a good while, they made a higher salary, and so the contention was that our people made too much money, and so they made too much money for what they were producing. So therefore, their age was involved in that.

J.A. 523. This statement, taken in conjunction with other similar statements, was not related to a person, employment decision, or hiring or firing practice, and therefore is not sufficiently probative of age discrimination to proceed under the ordinary standards of proof. In addition, the statement does not reflect that any employment decisions were based on age because the statement is modified by the words "so the *contention* was." This statement merely explains that when considering the higher paid employees, the length of service would naturally be a factor since one would normally expect older employees and longer tenured employees to be higher paid, but it does not reflect or rise to the level of indicating that age was a determining factor on which jobs were eliminated or employees with higher salaries were terminated. Finally, Lutz's statement, taken in its proper context, merely indicates that the intent behind Clay's reorganization was aimed at reducing overhead and expenses. It does not evince a discriminatory animus to discriminate on the basis of age.

Scott's statement about "dead wood" was made in reference to employee evaluations, regardless of age. In its context, the evaluations were to apply to all employees, and were part of the overall review of Clay's operations. In addition, the statements attributed to Scott: "too many people have been around here too long and make too much money" and "if employees had been there 10 years or more, they needed to move on," apply equally to employees under age 40 as well as employees over age 40—in essence they apply only to length of service, not age of the employee, as did Lutz's statement. The EEOC has not presented any evidence to suggest otherwise. While "[t]here may well be cases

in which seniority is a code word for discrimination," *Arnold v. United States Postal Service,* 863 F.2d 994, 1000 (D.C.Cir. 1988), *cert. denied,* 493 U.S. 846, 110 S.Ct. 140, 107 L.Ed.2d 99 (1989),[4] this is not such a case. Finally, Sipes' testimony that another Clay official told him that Clay needed to restructure its benefit and compensation packages to "attract newer, younger people," and Scott's statement referring to "young blood" are not probative of age discrimination or a discriminatory purpose. We have rejected reliance on such statements, and thus with respect to Sipes' statement, we need not address whether his statement would be admissible at trial. In *Smith,* Chief Judge Haynsworth, in rejecting references that a company's future lies with its young as evidence of a discriminatory purpose, pointedly observed:

> In any enterprise, today's juniors will be tomorrow's seniors. Today's seniors can help create a foundation for tomorrow's growth and prosperity, but future realization of the potential of an enterprise lies principally with those who will be in positions of leadership and responsibility in the future.

618 F.2d at 1066.

The probative evidence of discrimination in this case is simply not on par with cases such as *Wilhelm v. Blue Bell, Inc.,* 773 F.2d 1429 (4th Cir.1985), *cert. denied,* 475 U.S. 1016, 106 S.Ct. 1199, 89 L.Ed.2d 313 (1986); a case where we upheld a district court's denial of a judgment notwithstanding the verdict where the probative evidence was substantial, and included discriminatory statements directed at some individuals who eventually suffered an unfavorable employment decision—under the circumstances in *Wilhelm,* the evidence could not have been more direct. We do not glean from the record similar, compelling evidence, of discrimination—no nexus exists between the alleged discriminatory statements and *any* of the employment decisions made by Clay. A fair-minded jury simply could not return a verdict for the

---

**4.** *But see Williams v. General Motors Corp.,* 656 F.2d 120, 130 n. 17 (5th Cir.1981) ("seniority and age discrimination are unrelated"), *cert. de-* nied, 455 U.S. 943, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982).

EEOC on the evidence presented. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* In short, a finding of age discrimination would "only be an outright conjecture and not by any rational assessment of probabilities." *Lovelace*, 681 F.2d at 243–44.[5] Thus, we turn to the *McDonnell Douglas* paradigm.

■ Alternatively, the EEOC seeks to proceed under *McDonnell Douglas*. Bowman and Herman established a *prima facie* case under the language of *Herold*, "that persons outside the protected class were retained in the same position." Matters are not as rosy for Whittington, Brown, and Houck. As to these three discharge claimants, they failed to establish a *prima facie* case. As a means of introduction, or perhaps reiteration, each claimant would have to satisfy the fourth element of a *prima facie* case by establishing "that persons outside the protected class were retained in the same position or that there was some other evidence indicating that the employer did not treat age neutrally in deciding to dismiss the plaintiff." *Herold*, 864 F.2d at 320 (citing *Western Electric*, 713 F.2d at 1014–15).

Whittington's position as quality control supervisor was not filled, but his old position as pressroom supervisor was filled by Fred Lail, age 48. Brown's position as Mrs. Johnson's aide was filled by a person of unknown age; her comptroller's spot was filled by Sipes, age 46; and her bookkeeping functions were filled by a 53 year-old. All of these replacements are within the protected class covered by the ADEA, and thus require the claimants to demonstrate that Clay did not treat age neutrally

with respect to each employment decision. We feel that they have not met this burden.

The statements made by Scott were not directed toward anyone or any particular employment decision. The evidence as a whole does not reflect a "youth movement," or that Clay had a pattern of discriminating on the basis of age. In fact, there was evidence that the average age of Clay's employees went up from the time Scott arrived at Clay until the time Clay moved for summary judgment. As stated earlier, Lutz's remarks were in line with reducing costs and overhead, not an attempt to discriminate on the basis of age. In addition, the claimants' own admissions bolster our conclusion here. Finally, the EEOC failed to demonstrate that Clay treated any discharge claimant differently than a younger worker in a similar position. We cannot perceive, on the record before us, how Whittington, Brown, and Houck created a triable issue on the fourth element of a *prima facie* case.

■ Even if the discharge claimants established a *prima facie* case, the claimants have not proffered sufficient probative evidence that the legitimate, non-discriminatory, reasons for discharge offered by Clay were pretextual or unworthy of credence. On the pretext issue, each claimant must demonstrate by a preponderance of the evidence that Clay's decision to terminate the claimant was based upon age or that the reasons proffered by Clay were simply "unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095. The record is devoid of evidence indicating that Clay's proffered reasons for discharging Bowman and Herman, or any of the other discharge claimants, were pretextual or unworthy of credence. Furthermore, there is simply a dearth of evidence to create a triable issue as to whether any of the discharge claimants were dismissed on account of age. It is on this basis, that we find that summary

---

5. The evidence indicative of a discriminatory pattern of decisionmaking is wholly lacking. Interestingly, the EEOC has offered no statistical evidence to affirmatively show that older workers were displaced by younger workers. In fact, Clay filled many key management and line positions with members of the protected class. In addition, Clay urged many employees in the protected class to remain with the company. The dissent's view with respect to the discharge claimants is nothing short of strict liability against a company that terminates senior employees in a company downsizing or reorganization.

judgment was appropriate with respect to Bowman and Herman. In so ruling, we recognize that in discrimination cases there will be no proverbial "smoking gun" evincing age discrimination, however, as we view the evidence as a whole, the proffered reasons for discharge were not rebutted directly or circumstantially, and hence act to defeat each discharge claimant's cause of action. After a long, litigious process, what is really before this court, is a vain attempt by the EEOC to create a triable issue of age discrimination out of little more than thin air.[6] While the district court never reached the issue of the applicability of *McDonnell Douglas* to this case, its failure is of no consequence. Clay was entitled to summary judgment on the discharge claims because three of the discharge claimants failed to establish a *prima facie* case, and all of the discharge claimants failed to produce probative evidence that Clay's proffered reasons for discharge were pretextual or based upon age. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095.

## B

██ The four constructive discharge claimants, Larry Linham, Larry Herman, Frank Childers and Tony Childers, all resigned following Scott's arrival. These individuals, with the exception of Larry Linham, worked in a sales position for years with Clay and they resigned after Clay changed the terms and conditions of their employment by placing them on straight commissions, without expenses or company cars, and requiring that they (except for Linham) sign noncompetitive agreements as a condition of their continued employment. During this period, Clay hired two sales representatives, James Mangum, who was under 40 and was "believed"[7] to be

paid an annual salary; and Martha Scott Preddy Andrews, who was 50, placed on straight commission and provided a company car for five months.

Each constructive discharge claimant must demonstrate that the employer deliberately made working conditions intolerable and thereby forced each claimant to quit. *EEOC v. Service News Co.*, 898 F.2d 958, 962, n. 1 (4th Cir.1990); *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir.1985), *cert. denied*, 475 U.S. 1082, 106 S.Ct. 1461, 89 L.Ed.2d 718 (1986).

"Deliberateness exists only if the actions complained of 'were intended by the employer as an effort to force the employee to quit.'" *Bristow*, 770 F.2d at 1255 (quoting *EEOC v. Federal Reserve Bank of Richmond*, 698 F.2d 633, 672 (4th Cir.1983), *rev'd on other grounds*, 467 U.S. 867, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984)). Thus, each claimant must demonstrate that Clay's actions were specifically *intended* to force each claimant to quit. *Bristow*, 770 F.2d at 1255 (citation omitted). Intolerability is "assessed by the objective standard of whether a 'reasonable person' in the employee's position would have felt compelled to resign." *Id.*

"Where, however, all employees are treated identically, no particular employee can claim that difficult working conditions signify the employer's intent to force that individual to resign." *Id.* (citing *Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1256 (8th Cir.1981)).

The EEOC's position and evidence to support the constructive discharge claims can be summarized by the following:

Coupled with evidence of age bias in this case, the more favorable treatment ac-

---

**6.** The EEOC sought many of the claimants out and encouraged them to file charges of discrimination under the ADEA. In several instances, the claimants refused to sign affidavits as prepared by the EEOC. We think this exchange at Brown's deposition sums up the essence of the EEOC's case:

Q. And was the age discrimination [c]harge the way you were going to find out why you were terminated?
A. I felt that it was.

J.A. 372. The ADEA was simply not designed to provide employees an avenue to resolve why they were discharged. If it was, every employee covered by the Act who suffered an unfavorable employment decision would be encouraged to file a charge of discrimination with the EEOC. The resulting burgeoning caseload would not do just service to an employee with a bona fide cause of action, the EEOC, or the courts.

**7.** *See infra* p. 945 and note 9.

corded Mangum, and potentially one or more sales representatives, supports an inference of age discrimination in the treatment of these claimants. EEOC Reply Brief at 22.[8]

As to the constructive discharge claims, the EEOC's evidence falls woefully short of a showing of deliberateness or intolerability. Scott and Lutz testified that under the commission compensation arrangement, an aggressive salesperson could make more money. Even if these changes amounted to a slight cut in pay, the conditions did not rise to the level where a reasonable person would resign under the circumstances. As the court in *Bristow* observed:

> Every job has its frustrations, challenges and disappointments; these inhere in the nature of work. An employee is protected from a calculated effort to pressure him into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by his co-workers.

*Bristow*, 770 F.2d at 1255. In this case, there is no evidence of a "calculated effort to pressure" any of the constructive discharge claimants to quit. In addition, the only evidence of disparity between the constructive discharge claimants and the new employees is the fact that Andrews was provided a company car for five months and Franklin Childers' affidavit which stated: "The company hired Jimmy Mangum (30s) and I believed he was salaried." There is no evidentiary support for this belief on Mr. Childers' part.[9] Even if there was, the evidence of disparity in the record simply does not evince that the conditions imposed were "unreasonably harsh[er]" than those faced by the new employees. This point is highlighted by Scott's report and recommendation[10] and Andrews' affidavit.[11]

The EEOC's reliance on *J.P. Stevens & Co. v. NLRB*, 461 F.2d 490 (4th Cir.1972), is misplaced. The conditions imposed on an employee in *J.P. Stevens* made it almost impossible for her to earn minimum wage. Moreover, the conditions imposed, under the circumstances, were drastic, making it impossible for her to meet her daily production requirement. In addition, in *J.P. Stevens*, there was substantial evidence that other employees worked under different conditions. *Id.* at 494–95. The evidence in this case of different working conditions is meager, if non-existent, and works to distinguish *J.P. Stevens*, as well as *Hosley v. Armour & Co.*, 743 F.2d 199 (4th Cir.1984), *cert. denied*, 470 U.S. 1028, 105 S.Ct. 1395, 84 L.Ed.2d 784 (1985), another case cited by the EEOC. In *Hosley*, we found that a black employee was constructively discharged after he was harassed for filing a charge of discrimination and denied equal status with white employees. *Id.* at 209. In the case *sub judice*, the circumstances

---

**8.** The EEOC cites various portions of Lutz's deposition for support that the new sales representatives were not required to sign non-competitive agreements. A fair reading of his deposition does not support this. From the record, it is clear that the constructive discharge claimants were required to sign non-competitive agreements. The record does not reflect that Mangum and Andrews were not required to sign non-competitive agreements. Even if Mangum and Andrews were not required to sign non-competitive agreements, our conclusion with respect to the constructive discharge claimants would remain the same.

**9.** Indeed this affidavit does not conform with Fed.R.Civ.Proc. 56(e) which requires that affidavits be based upon personal knowledge. *See Antonio v. Barnes*, 464 F.2d 584, 585 (4th Cir. 1972) ("absence of affirmative showing of personal knowledge of specific facts vitiates sufficiency"). Mr. Childers' affidavit might well be based upon hearsay or intuition.

**10.** In Scott's report and recommendation, he states "The entire Sales Department should be on 100% commission or incentive basis of some nature. I have no problems with advances against commissions, nor do I have any problem with short term salaries for new field people while we train them in the way we want things done. But the overall concept has to be a direct compensation to sales so that we can control our costs in this area."

**11.** In her affidavit, Andrews (a member of the protected class) testified that she was paid on straight commission and provided a company car for five months. The fact that Andrews, a newly hired employee and member of the protected class, was paid on straight commission clearly demonstrates that all the members of the sales force were subjected to essentially the same working conditions.

surrounding the change in conditions were designed to create a more aggressive work force and to reduce operating costs.

This case falls closer in line with *Bristow*. Bristow assumed a supervisor's job for a very large district at a local newspaper. Bristow was pressured by his supervisors to financially account for uncollected receivables from newspaper deliveries. Bristow acquiesced after he had a meeting with his supervisors. No further action was going to be taken with respect to Bristow. Thereafter, he resigned. *Id.* at 1253–54. Bristow believed the paper wanted him out because of his age. Reversing the district court's denial of defendant's motion for judgment n.o.v., the court observed that it was "obvious that Bristow's resignation arose from a particular financial dispute with his supervisors, and at no time did anyone impose intolerable working conditions with the intent to compel him to retire." *Id.* at 1256.

In the present case, there is simply a lack of concrete evidence, as in *Bristow*, that the conditions imposed were intolerable. Furthermore, there is a lack of concrete evidence that Clay *intended* that the claimants quit because of their age. "Certainly ... [Clay] did not wish to force all of its employees to resign." *Paroline v. Unisys Corp.*, 879 F.2d 100, 114 (4th Cir.1989) (Wilkinson, J., concurring in part and dissenting in part) (quoting *Bunny Bread Co.*, 646 F.2d at 1256).[12] It is not for this court or any other governmental agency to direct the business practices of any company. In the context of this case, Clay was free to make its business decisions, including reorganizing its work force, so long as it did not violate the ADEA. It is not the purpose of the EEOC nor the function of this court to second guess the wisdom of business decisions. Accordingly, the district court did not err in granting Clay's motion for summary judgment on the four constructive discharge claims raised on this appeal.

## III

We affirm the district court's grant of summary judgment on the five discharge claims because there are no genuine issues of material fact and therefore Clay is entitled to judgment as a matter of law. For similar reasons, we affirm the district court's grant of summary judgment to Clay on the four constructive discharge claims.

AFFIRMED.

RESTANI, Judge, dissenting:

I dissent from the majority's opinion because I find that plaintiff-appellant, the Equal Employment Opportunity Commission ("EEOC") has produced sufficient direct evidence of age discrimination to defeat summary judgment.

Although the issue has not been addressed by this Circuit, numerous courts have recognized the correlation between salary, seniority and age, and have held that discharge of more senior and higher-salaried employees as a cost-savings measure constitutes evidence of a violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–34 (1988). *See Metz v. Transit Mix, Inc.*, 828 F.2d 1202, 1207 (7th Cir.1987). As the Seventh Circuit stated in *Metz*, "[c]ourts have ... emphatically rejected business practices in which 'the plain intent and effect ... was to eliminate older workers who had built up, through years of satisfactory service, higher salaries than their younger counterparts.'" *Id.* at 1206 (quoting *Leftwich v. HarrisStowe State College*, 702 F.2d 686, 691 (8th Cir.1983); *see Abbott v. Federal Forge, Inc.*, 912 F.2d 867, 875 (6th Cir.1990) (seniority is illegitimate basis for employment decisions when it adversely affects older employees); *Jardien v. Winston Network, Inc.*, 888 F.2d 1151, 1157–58 (7th Cir.1989) (replacement of older employee with younger, lower-salaried employee to save salary costs not a defense to ADEA claim); *White v. Westinghouse Electric*

---

**12.** The *Paroline* decision was superseded in *Paroline v. Unisys Corp.*, 900 F.2d 27 (4th Cir.1990) (en banc). In that decision, the court simply adopted Judge Wilkinson's dissenting view that summary judgment was appropriate on the constructive discharge claim. The remainder of Judge Murnaghan's panel opinion remained in effect. *Id.* at 28.

*Co.,* 862 F.2d 56, 62 (3d Cir.1988) (discharge to avoid payment of pension benefits relevant to ADEA claim because pension benefits inextricably linked to years of service and age); *Geller v. Markham,* 635 F.2d 1027, 1034 (2d Cir.1980) (no defense that hiring teachers below certain experience level was necessary as cost-cutting measure), *cert. denied,* 451 U.S. 945, 101 S.Ct. 2028, 68 L.Ed.2d 332 (1981); *Laugesen v. Anaconda Co.,* 510 F.2d 307, 313 (6th Cir. 1975) (discharge based on length of service which is inevitably related to age shows discrimination); *but see Williams v. General Motors Corp.,* 656 F.2d 120, 130 n. 17 (5th Cir.1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982) (seniority and age discrimination unrelated).[1] The regulations implementing the ADEA also prohibit differential treatment based on the cost of employing older workers. *See* 29 C.F.R. § 1625.7(f) (1991).[2]

For purposes of summary judgment, it does not require a great leap of imagination to infer from the record in this case that the decisions to terminate the five discharge claimants—Gary Houk, Roosevelt Whittington, Richard Bowman, Robert Herman, and Edna Brown—were based on seniority and salary. In most employment situations, there is a natural correlation between seniority, salary and age. At Clay Printing Company ("Clay"), where there was little employee turnover and the discharge claimants each had between seventeen and forty years of service with the company, the correlation was perhaps greater than average. Because I believe the majority overlooks aspects of the

record from which age discrimination could be inferred, the salient facts are set forth here.

The defendant-appellee, Clay, and its owner, Nancy Johnson, retained Ray Scott as a management consultant in July or August 1987. After two visits to the Clay facility and interviews with plant employees, Scott made recommendations for restructuring the company. In his initial recommendations, he stated that the company was overstaffed, and had "approximately 15, and maybe as many as 20 employees too many." A. 259. He stated that there was too much "dead wood" (A. 264), and "too many people with titles ... doing little or nothing." A. 259. Scott was given the task of reorganizing Clay with the support of the Board of Directors. The Board made decisions, in part, based on Scott's recommendations. In the summer and fall of 1987, Clay terminated several senior employees; until that point, Clay had had very little employee turnover. Scott began to play an important role in management at Clay: he visited the company every few weeks; gave instructions to company officials; participated in or made personnel decisions including hiring and firing; and ordered or implemented terminations of some employees.

Shortly after arriving at Clay, Scott requested a list of employees with the starting dates of their employment, current salaries, and dates of their last three raises. Several workers testified that the company posted a list that included the name and seniority date of each employee: lines were

---

**1.** Perhaps the majority would find that preventing an employer from cutting costs by terminating higher-paid, more senior employees is an undue interference with business judgment. As one court noted, however, the ADEA strikes a certain balance between employer autonomy and the rights of older employees, which makes such action impermissible:

> Congress enacted the ADEA precisely because many employers or younger business executives act as if they believe that there are good business reasons for discriminating against older employees. *Retention of senior employees who can be replaced by younger, lower-paid persons frequently competes with other values, such as profits or conceptions of economic efficiency. The ADEA represents a*

> *choice among these values.* It stands for the proposition that this is a better country for its willingness to pay the costs for treating older employees fairly.

*Graefenhain v. Pabst Brewing Co.,* 827 F.2d 13, 21 n. 8 (7th Cir.1987) (emphasis added) (quoted in *Metz,* 828 F.2d at 1210) (overruled on other grounds by *Coston v. Plitt Theatres, Inc.,* 860 F.2d 834, 836 (7th Cir.1988)).

**2.** 29 C.F.R. § 1625.7(f) provides:

> A differentiation based on the average cost of employing older employees as a group is unlawful except with respect to employee benefit plans which qualify for the section 4(f)(2) exception to the Act.

drawn through the names of employees who were no longer there, and it appeared the company was moving down the list.[3] There was some evidence that Scott verbally harassed older workers, and several older employees left because they believed they would be terminated.[4] From the outset, Scott expressed dissatisfaction with the seniority of the work force and salaries paid to senior employees. He told Nancy Johnson that "too many people have been here too long and make too much money" (A. 212), and he remarked "if you've been here 10 years you've been here too long." A. 209. He said the company "didn't have any young blood ... being crossed [sic] trained" and "he was surprised the company was making money." A. 212. He asked Edna Brown if she would take early retirement, and inquired as to whether Richard Bowman could be retired early. One employee stated that the only problem Scott had with Richard Bowman was that he was paid too much. Another employee heard Scott state in reference to Richard Bowman: "[W]e aren't going to pay pressman wages to a platemaker." A. 247. In a memo to the Board of Directors, in which Scott recommends that Roosevelt Whittington become the quality control manager, Scott states: "Unfortunately, this gentleman has over 25 years of experience with the company. If he is not willing to accept this position and be effective at it, I would have to recommend that we ask for his resignation." A. 265.

Scott was involved in some capacity in the terminations of each of the five discharge claimants. Scott himself terminated Houck, and ordered the termination of Whittington. Bowman and Herman were terminated two weeks after Scott wrote to the company president instructing him to terminate more workers in the production area: the letter states that "it is time to start hiring people that we know are good and la[y] off the gold brickers." A. 289. Scott and Nancy Johnson asked Edna Brown if she would take early retirement; she refused and a few days later was transferred to the position of Mrs. Johnson's personal assistant. She was terminated six months later; although Nancy Johnson made the decision to terminate Brown, she discussed it with Scott.

There was also direct evidence that Scott's dissatisfaction with the salaries paid to senior employees was translated into action. Whittington was fired right after a production meeting which included Scott, Nancy Johnson, and Ned Lutz. Whittington was discharged by Lutz: when he asked why, he was told it was because he made "more money on the floor than anybody else." A. 642.

Scott was also responsible for changing the employment conditions of the constructive discharge claimants. Originally, these claimants received a salary plus commission. At Scott's direction, Clay placed them on a flat five percent commission, required them to pay their own business expenses, revoked use of company cars, and required them to sign noncompetition agreements. During this time, Clay hired new sales representatives, at least one was under 40; one witness testified that he believed the new representatives were salaried and it is clear that one new employee was given a company car for a period.

About the time of the terminations, Jerry Helmke, who became vice-president of finance, talked about improving fringe benefits. He stated that if the company improved its benefits package, it could attract

---

3. Melvin Vinson (age 46), a pressman, stated that he had seen the seniority list, and "it was clear the company was moving down the list, getting rid of the most experienced workers." A. 251. He stated that Scott had singled out older workers for pay decreases or no raises.

4. The record reveals that Scott used profanity towards Larry Herman, one of the constructive discharge claimants, and implied he was untrustworthy. Scott asked Howard Little (date of birth 1936), the cameraman at Clay: "What are you still doing here? I thought they would have fired you by now." A. 230. William Vaughan (date of birth 1935) stated that Scott frequently used profanity towards him and other employees; Vaughan resigned because he believed the company was going to terminate him. Melvin Vinson, age 46, also testified that he resigned because he was sure the company was going to fire him.

"newer, younger people and they are more talented."[5]  A. 619–620.

Furthermore, Ned Lutz, Clay's vice-president of operations, conceded in his deposition that seniority and salary were involved in employment decisions:

> If a person had been there a good while, they made a higher salary, and so the contention was that our people made too much money, and so they made too much money for what they were producing. So, therefore, their age was involved in that.

A. 523.  Lutz also testified that the longer-tenured employees were under more pressure and received fewer raises than the newer employees.  Lutz noted that he was referring to tenure, not to age, but seniority and age are correlated.

The majority attempts to discount the discriminatory statements by Scott, Lutz, and Helmke in several respects.  First, the majority states that the claimants were unable at their depositions to identify specific evidence of age discrimination.  Second, the majority finds Clay's statistical evidence persuasive.  Third, the majority finds the statements age-neutral, or unrelated to a particular employment decision or pattern of decisionmaking.

The first and second reasons are not dispositive on summary judgment when there is conflicting evidence in the record. *See EEOC v. Hernando Bank, Inc.*, 724 F.2d 1188, 1196 (5th Cir.1984) (under Equal Pay Act, proper determination on summary judgment requires more than mere conclusional attestation by discriminatees that they are unaware of discrimination); *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 340, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396 (1977) (statistical evidence is subject to rebuttal and usefulness depends on facts and circumstances).  The third reason appears to misconstrue critical aspects of the record.

The record indicates that Scott was the prime mover behind the lay-offs at Clay. He was an integral part of management at Clay.  He played a direct role in terminations of four of the claimants, and was involved in the decision to reassign and then terminate the fifth claimant.  At his direction, the working conditions of the constructive discharge claimants were changed.  He voiced dissatisfaction with the seniority of the work force, and there was evidence that Clay was terminating the most senior employees.  One of the claimants was told that he was discharged because his salary was higher than that of other employees.  Lutz's deposition testimony confirms the belief at Clay that more senior employees were paid too much in light of their productivity.  Scott was the source of many of the discriminatory statements: he was also the animus behind the discharges.  For the majority to find that the statements and pattern of decisionmaking were unconnected belies the record.

In addition, Scott's reference to "young blood," and Helmke's statement that Clay needed to attract younger employees, have an obvious connection to age, and in light of other evidence in the case, cannot be considered stray comments in the workplace.[6]  Considering all the evidence in the light most favorable to EEOC, as is required on summary judgment, an issue of fact arises as to whether age was the determining factor in the decisions to terminate.  While Clay introduced some evidence that the discharges were based on performance, the court cannot resolve issues of fact on summary judgment.

Likewise, with respect to the constructive discharge claimants, the evidence in this case supports a finding of age discrimination.  The sales representatives were stripped of substantial benefits; they were taken off an annual salary and placed on a

---

**5.** Helmke's statement was introduced through the deposition of Edward Sipes.  Clay argues the statement should be disregarded because it is hearsay, and was made before Helmke joined Clay.  The statement shows state-of-mind, and is not hearsay.  In addition, the statement was made at a meeting with Clay officials, and the

record is unclear as to whether Helmke was a Clay employee at that time.

**6.** The majority finds these comments age-neutral.  I question what type of evidence the majority would require before permitting a plaintiff to prevail.

flat commission, and were required to pay their own business and travel expenses. Moreover, they were required to sign non-competition agreements that would impede their ability to find alternate employment if they left the company. Evidence in the record shows new representatives were hired, at least one of whom was under 40, and these representatives received greater benefits. In light of this evidence, and other evidence in the case that indicates age bias, summary judgment should have been denied.

I would reverse and remand for trial.