**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

ROY L. COGGINS,
Plaintiff-Appellee,

v.

GOVERNMENT OF DISTRICT OF
COLUMBIA,
Defendant-Appellant.

No. 97-2263

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
T.S. Ellis, III, District Judge.
(CA-96-1696-A)

Argued: October 29, 1998

Decided: February 19, 1999

Before ERVIN and NIEMEYER, Circuit Judges, and BUTZNER,
Senior Circuit Judge.

_____

Reversed and remanded by unpublished opinion. Judge Ervin wrote
the opinion, in which Judge Niemeyer and Senior Judge Butzner
joined.

_____

**COUNSEL**

**ARGUED:** Louis Edward Dolan, Jr., PEABODY & BROWN, Wash-
ington, D.C., for Appellant. John Edwards Harrison, HARRISON &
HUGHES, P.C., Alexandria, Virginia, for Appellee. **ON BRIEF:**
William F. Causey, Gina S. Love, PEABODY & BROWN, Washing-

ton, D.C.; Charles L. Reischel, Appellate Division, OFFICE OF CORPORATION COUNSEL, Washington, D.C., for Appellant.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

## OPINION

ERVIN, Circuit Judge:

This is an appeal of a jury verdict in a Title VII wrongful discharge action. Roy L. Coggins ("Coggins"), a Chief Steward at the District of Columbia ("the District") Department of Corrections prison in Lorton, Virginia ("Lorton Facility"), was allegedly fired because he refused to complete required annual evaluations of his subordinates despite repeated requests from his immediate supervisor, Francis Henderson ("Henderson"). Coggins, a Caucasian, sued the District for conspiring to create a pretext to fire him and to replace him with a less-qualified African-American. A jury awarded Coggins $50,000 for pain and suffering. The district court denied the District's motion for judgment as a matter of law and awarded Coggins $11,053.40 in back pay and $48,375 in legal fees. On review of the trial record, we find no evidence that the decision makers who terminated Coggins were motivated by racial animus. Accordingly, because no reasonable jury could find that the District terminated Coggins because of his race, we reverse the judgment of the district court and remand the case with instructions to enter judgment for the defendant.

I.

Roy L. Coggins was fired because he allegedly refused to complete required annual personnel evaluations of his subordinate staff. Both sides agree that Coggins never completed the evaluations.

In early May of 1995, Henderson, an African American, gave Coggins a direct order to complete performance evaluations of Coggins'

culinary staff by May 22, 1995. On May 18, 1995, Coggins wrote a memorandum to Henderson and his superiors "requesting to be relieved of the duty of evaluations until all is resolved" in the Bessye Neal case because "I continue to have a cease and desist order on me" and "I do not want to be accused of tampering with witnesses."

Coggins was one of several named defendants in a class-action sexual harassment lawsuit. See, e.g., Bessye Neal v. Director, District of Columbia Department of Corrections, No. CIV.A.93-2420 (RCL, 24), 1994 U.S. Dist. LEXIS 21338 (D.D.C. Aug. 25, 1994). One of Coggins' subordinates, Denise Hessing, had filed charges of sexual harassment against Coggins. Two other subordinates were witnesses in the case. In spite of the ongoing lawsuit, Hessing and the two witnesses were never transferred from Coggins' staff. Coggins continued to maintain supervisory responsibility over them until his termination.

On May 24, 1995, Henderson met with Coggins about the evaluations. During this meeting, Coggins asked Henderson if Henderson had forwarded Coggins' May 18th memorandum up the chain-of-command. Henderson responded that he had refused to send the memorandum up the chain-of-command because the memorandum had coffee stains on it and he believed that his superiors would think less of him if he sent them a stained document. At this meeting, Henderson gave Coggins a memorandum dated the same day that relieved Coggins of his responsibility to evaluate Hessing, the plaintiff in Bessye Neal, but still ordered Coggins to rate the remaining staff members, including the two witnesses in the harassment case, by the close of business on June 1, 1995. Henderson then ordered Coggins to accompany him to the office of Henderson's boss, Vincent Gibbons ("Gibbons"), a Caucasian and the Warden of the Central Facility.

At this second meeting, Coggins repeated his concerns to Gibbons. Since no other member of Coggins' staff was a member of the protected class and since Henderson was already rating Hessing, Gibbons ordered Coggins to complete the rest of the evaluations because in so doing Coggins would not be violating any court order. Coggins still refused to complete the evaluations.

During either this or a later meeting that day, Gibbons contacted Mark Leavitt, another Caucasian, who was the Deputy Director of

3

Administration for the Department of Corrections and the liaison between the Office of Corporation Counsel and the Department of Corrections for the Bessye Neal case. Leavitt confirmed that neither Hessing nor the two witnesses were members of the protected class and that Coggins could rate all of them. Coggins still refused to comply.

Later on May 24th, Coggins, accompanied by his wife Becky and a union representative, returned to Gibbons' office for yet another meeting with Gibbons. Although Coggins claims that he then agreed to rate all of his subordinates, but would do so under "duress," Gibbons does not remember Coggins making this concession. Henderson was not present at this meeting.

At or about the same time Coggins was meeting with Gibbons, Henderson was in his own office writing a Request for Advance Notice of Proposed Action, in which he recommended that Coggins be fired for insubordination. Although this is the harshest penalty available, it was well within Henderson's discretion to fire Coggins under the District's personnel policy. See D.C. Personnel Regs. pt. I, ch. 16, tbl. 1618.1(5) (1990). Henderson made this recommendation on May 24th despite the fact that in his last memorandum to Coggins, Henderson had given Coggins until June 1st, eight days later, to complete the evaluations. Henderson also forwarded Coggins' May 18th memorandum up the chain-of-command, coffee stains notwithstanding.

Coggins claims that he suffered severe health problems as a result of these meetings and the pressure placed upon him by Henderson. On May 24th he sought medical treatment while on his way home from work and was prescribed valium. He took the valium and became ill. Coggins apparently experienced a harmful interaction between the valium and other medication he was taking at the time. He was subsequently hospitalized from May 24 through August 1995. Coggins claims that this hospitalization prevented him from completing the evaluations by the June 1st deadline because by the time he was released from the hospital, he had already been fired.

While Coggins was hospitalized, Henderson prepared and sent to Coggins an Advance Notice of Proposed Action, in which Henderson

4

formally charged Coggins with insubordination. This Notice also advised Coggins: (1) that Coggins had the right to respond to the charge with any defenses available; (2) that any response should be forwarded to the Disinterested Designee assigned to this action, Regina Gilmore (an African-American); (3) that Gilmore would make a recommendation to Bernard Braxton, the Deputy Director for Institutions and the Deciding Official assigned to this action; and (4) that Coggins could obtain copies of the evidence upon which this charge was based. Although Coggins received two copies of this Notice, he did not file a written response.

In early August, the Disinterested Designee, an independent official designated by regulation as an internal check on the disciplinary process, agreed that, based upon the information made available to her, Coggins was insubordinate. The Designee then recommended that Coggins be punished with a reduction in rank and a 45-day suspension without pay.

On August 14, 1995, the Deciding Official Braxton wrote a letter informing Coggins that he would be fired for insubordination. Gibbons recused himself from these proceedings because of his personal involvement in the two meetings. Although Braxton drafted the termination letter, it was ultimately reviewed and signed by another Caucasian Warden Paul Krull ("Krull"). Later, the District reversed its termination decision and reinstated Coggins, placing him on suspension.

II.

This Court reviews the district court's denial of a motion for judgment as a matter of law under Rule 50(b) de novo . See Fed. R. Civ. P. 50(b). If there is evidence upon which a jury could reasonably find in favor of Coggins, this Court must affirm the final verdict. Further, in reviewing the record, this Court is "not free to weigh the evidence or to pass on the credibility of the witnesses" but instead must "view the evidence most favorably to [Coggins] and give [Coggins] the benefits of all reasonable inferences from the evidence." United States v. Tobias, 899 F.2d 1375, 1378 (4th Cir. 1990) (citations omitted).

The parties do not dispute that before the disagreement that ultimately led to his termination, Roy L. Coggins was an exemplary

5

employee. By all accounts, Chief Steward Coggins was responsible for quickly transforming his dining hall, the largest in Lorton Facility, from a substandard liability into an exemplary operation. His immediate supervisor, Acting Deputy Warden for Support Services Francis J. Henderson, volunteered during cross-examination that Coggins' previous job performance had been "outstanding." Examining the record in the light most favorable to Coggins, there was enough evidence for a reasonable jury to conclude that Henderson harbored racial animus against Coggins. It is undisputed that Henderson made the initial recommendation on May 24, 1995 which eventually resulted in Coggins' termination on August 14, 1995.

The central issue in this appeal is the relationship between Henderson's alleged racial animus and the ultimate decision to terminate Coggins. The key question is whether there was a nexus between (1) the racial animus that allegedly motivated Henderson's initial recommendation for termination; and (2) the ultimate rationale relied upon by Henderson's superiors in actually terminating Coggins. Coggins argues that because Henderson's superiors blindly accepted Henderson's racially-motivated recommendation, their ultimate decision was motivated by racial bias. The District argues that regardless of whether Henderson's initial recommendation was racially motivated, the ultimate decision was made by independent, unbiased decision makers who relied upon the legitimate, nondiscriminatory rationale that the District's personnel policies authorize termination for insubordination.

This Court has long recognized two methods of proving employment discrimination: the conventional approach and the judicially-created, shifting burden-of-production scheme. See generally, O'Connor v. Consolidated Coin Caterers, Corp., 56 F.3d 542, 545-46 (4th Cir. 1995) (stating two schemes of proof), rev'd on other grounds, 517 U.S. 308 (1996); EEOC v. Clay Printing, Co., 955 F.2d 936, 940 (4th Cir. 1992) (stating that discrimination may be proven "under ordinary standards of proof, by direct or indirect evidence relevant to and sufficiently probative of the issue"); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800-06 (1973) (holding that because employment discrimination is often difficult to prove, plaintiffs are alternatively allowed to prove their case through a judicially-created scheme); Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248,

6

252-56 (1981) (same). Under either scheme of proof, there is no evidence in the record that proves that the ultimate decision makers who terminated Coggins were motivated by racial animus.

A.

First, under the conventional approach, while there is ample direct and circumstantial evidence that Henderson may have been motivated by racial animus, there is simply no direct or circumstantial evidence that the ultimate decision makers harbored racial animus against Coggins. The fact that both Krull and Gibbons, first and third in Coggins' chain-of-command, are both Caucasian makes any anti-Caucasian bias unlikely.

Although one of the documents relied upon by these decision makers was Henderson's Request for Advance Notice of Proposed Action, there is nothing discriminatory about the document. The facts alleged therein are undisputed by both sides. All Henderson states in the Request is that in his two meetings with Coggins on May 24, 1995 Coggins refused to rate his subordinates.

Even if we accept Coggins' claim that he later agreed to complete the evaluations, Coggins appears to have waived this defense. Despite receiving written notice twice of his right to present any applicable defenses, Coggins did not raise this fact before his termination. His Notice clearly stated, "If you do not wish to reply, a decision will be made based on all of the available information of record."

Moreover, the District independently investigated and verified Henderson's allegations and thereby purged any preexisting discriminatory taint from the final decision. Unrebutted testimony refutes Coggins' claim that the individuals who ultimately terminated him merely "rubber stamped" Henderson's recommendation.

When questioned on cross-examination about Braxton's draft letter, Krull stated that he carefully read over the draft letter, Henderson's two letters, the Disinterested Designee's report, and the Notice previously mailed to Coggins before he personally decided to terminate Coggins. Krull testified that if he had disagreed with the draft let-

7

ter, he would have held the letter and told Braxton that termination was inappropriate.

Since Coggins did not offer any evidence to contradict Krull's testimony or credibility, we accept that Krull fairly and impartially ascertained the merit of Henderson's complaint. This inference is supported by the District's own personnel regulations. Although Coggins was not charged with violating this specific provision of the District's personnel code, there is a regulation in the District's personnel code that appears to require Coggins' termination. Henderson wrote in his first letter to Coggins that he had previously counseled Coggins that "D.C. Personnel Regulation 1400.3, District Personnel Manual (DPM) Chapter 14 . . . in part, assigns all heads of departments and agencies the responsibility for assuring impartial, objective evaluations of work performances of employees under their jurisdiction." Accordingly, since Coggins was the head of food service for the Central Facility, his evaluations were an assigned duty and responsibility. The District's regulations give no discretion for "[r]efusal to carry out assigned duties and responsibilities." Even if it is a first offense, the only available punishment is "[r]emoval." See D.C. Personnel Regs. pt. I, ch. 16, tbl. 1618.1(5)(c) (1990).

B.

Second, under the judicially created scheme of proof, although Coggins may have been able to establish a prima facie case of discrimination, he was unable to rebut the District's legitimate, nondiscriminatory reason for his termination, namely that Coggins was insubordinate and such insubordination cannot be tolerated in the tense, paramilitary environment of a prison.

Warden Krull testified that even though the Disinterested Designee did not recommend termination, Krull decided to disregard the Designee's recommendation and to terminate Coggins because the special circumstances of a prison made insubordination more dangerous than in other employment contexts. Lorton Facility is run as a paramilitary organization where subordinates must follow the lawful orders of superiors without question. As Krull stated, "You can't run a prison when people don't do what they're told to do."

8

Since the trial proceeded to completion, we need not reexamine the entire prima facie case but rather may focus upon the "specific proofs and rebuttals of discriminatory motivation the parties have introduced." Gibson v. Old Town Trolley Tours of Washington, D.C., Inc., No. 97-2044, 1998 WL 786693, at *2, 1998 U.S. App. LEXIS 28389, at *5 (4th Cir. Nov. 12, 1998), quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 516 (1993).

When denying the District's motion for judgment as a matter of law, the district court erred in ruling that a jury could have reasonably found the District's proferred rationale for termination was pretextual. The district court believed the District's insubordination rationale could be considered pretextual in two ways: (1) that the District erroneously relied upon both Henderson's biased, misleading factual recounting of events and Henderson's unfounded initial charge of insubordination to terminate Coggins and (2) that the jury could have found that "fairly construed, the situation really didn't amount as much to insubordination as to an employee who didn't want to do something that he thought was contrary to law, and officials who were too impatient to deal with him and to deal with his concerns, however valid or invalid they were." Transcript, Volume #7, at 26, Coggins v. District of Columbia, No. CIVA.96-1966-A (D.D.C. July 25, 1997).

Both reasons fail to demonstrate that the District's insubordination charge was pretextual. First, as discussed above, none of the facts related in Henderson's two letters are disputed and any discriminatory taint was subsequently purged by the District's independent inquiry. The second reason at best appears to dispute the sound judgment or fair business practices of the District. Since the District subsequently reinstated Coggins, this argument may have some merit to it. Nevertheless, this Court is not concerned with judging the District's business or administrative acumen. The sole issue before us is whether Coggins' termination was motivated by racial animus and we have found no evidence to support that premise.

III.

The right to a jury trial is a fundamental right and no action affects this right more than the reversal of a jury verdict. See Neely v. Martin K. Eby Constr. Co., Inc., 386 U.S. 317, 322 (1967) (there is "no

9

greater restriction on the province of the jury"). In certain cases, however, reversal is warranted. On these facts, there simply was no nexus between Henderson's allegedly discriminatory conduct and Coggins' termination. Finding no evidence of racial animus in the actions of the ultimate decision makers, we reverse the jury verdict and remand to the district court for the entry of judgment as a matter of law for the District.

REVERSED AND REMANDED

10