Anthony J. PAPA, Plaintiff,

v.

UNION CARBIDE CORPORATION, Defendant.

Civil Action No. 2:96–0669.

United States District Court, S.D. West Virginia, Charleston Division.

July 9, 1997.

---

Joseph H. Chivers, Pittsburgh, PA, Richard H. Neely, Neely & Hunter, Charleston, WV, for Plaintiff.

Roger A. Wolfe, Kelley L. Mount, Jackson & Kelly, Charleston, WV, for Defendant.

## MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

Pending is Defendant Union Carbide's motion for summary judgment. For the reasons that follow, the Court **GRANTS** the motion.

## I. BACKGROUND [1]

In this case, Plaintiff Anthony J. Papa, age 66, contends that, but for Union Carbide's discrimination against him on the basis of his age, he would have received the promotion he received in 1996 several years earlier.

Papa works at Union Carbide's South Charleston Technical Center, where he is assigned to the research and development department of the Solvents and Intermediates Strategic Planning Unit. From 1982 to 1996, Papa was a grade 12 research scientist. According to Union Carbide, while promotions up to grade 9 are rewarded based on satisfactory performance and time in grade, promotions to grade 11 and beyond require significant commercial achievement, demonstrated scientific leadership, and general professional excellence.

The promotion process at the Tech Center normally begins two or more years before the actual promotion occurs. It is initiated when an employee's supervisor observes qualities in and performance by the employee that may merit promotion. Next, the department manager will attempt to solicit support for the promotion from other managers. Assuming this support is obtained, the supervisor places the employee's name on a two-year promotion plan. As the proposed time for promotion nears, the supervisor drafts a formal proposal in support of the candidate. This proposal is submitted to the department director. Upon approval, the director will submit the proposal for consideration by the T–Lab, a board composed of high-ranking Union Carbide scientists. The T–Lab in turn makes a recommendation to the research and development director, who then submits the proposal to the Quality Steering Committee for final review and approval.

From the late 1980's to the early 1990's, Papa worked under David Stanton, an associate director in a division known as the Oxo group. Papa's direct supervisor was David Miller. In 1990 and 1991, Papa received a high yearly performance rating, indicating his "[p]erformance [was] substantially beyond that accepted as normal." In recognition of this and his work in developing what is known as the DBSA Catalyst, Supervisor Miller, supported by Papa's former supervisor David Bryant, proposed in 1992 to Associate Director Stanton that Papa be promoted to grade 14. Associate Director Stanton supported the promotion as well, and in turn sought the support of David Saunby, the then-Director of the Solvents and Intermediates Strategic Planning Unit.

Director Saunby did not support the promotion. Saunby did not believe Papa was an above average performer because, except for 1991 and 1992, Papa had consistently been rated in annual performance evaluations at or below the normal requirements for his grade. Director Saunby also felt Papa had

1. Much of the Court's background discussion is derived from Union Carbide's Memorandum in Support of its Motion. Its recitation of the facts appears accurate and is largely uncontested by Papa.

not contributed enough original work over a sustained period of time, and, aside from his work on the DBSA Catalyst, had not produced enough commercially significant work to merit promotion. Director Saunby said he could not support the promotion unless Associate Director Stanton better documented the work that warranted Papa's above average performance rating.

Without Director Saunby's support, the proposed promotion stalled. Meanwhile, Saunby retired in June 1992 and was replaced by P.R. Kavasmaneck. Supervisor Miller and Associate Director Stanton resubmitted the promotion proposal to Director Kavasmaneck. Kavasmaneck indicated he intended to review carefully all proposal promotions to allow him to compare the candidates. He also said he would proceed slowly with his review until he could establish internal procedures for the managers to follow in proposing recommendations.

In early 1992, Papa was appointed leader of what was known as the Peroxide Risk Minimization Team ("team" or "peroxide team"), which had been chartered by the Oxo group in which Papa worked. Under Papa's leadership, disagreement developed among team members concerning the meaning of certain scientific data and what could be done to minimize the risks associated with peroxide. Union Carbide contends Papa failed to lead the team to resolution and ceased active participation in team meetings. This conduct, according to Union Carbide, scuttled Papa's chances for the grade 14 promotion.

Papa calls this "the great lie of this case," and contends he continued to lead and participate actively in the meetings until he was relieved of the assignment at his own request on February 12, 1993. He also says he continued to contribute to the team even after he was relieved.

On February 12, 1993, Papa met with Associate Director Stanton. Papa told Stanton he wanted to step down as team leader. According to Stanton, Stanton said he would agree on the condition that Papa continue to participate actively in team meetings. While Papa does not dispute Stanton imposed this condition, Papa testified, "Stanton never told me he was counseling me, warning me, or in any way reprimanding me about anything.... I thought the whole matter regarding the Peroxide Team had been resolved after the meeting, and did not learn of Stanton's supposed concern [about Papa's behavior] ... until many months later." Papa Aff. ¶ 12, Pl.'s Mem. Resp. Ex. 1. Nonetheless, Papa admitted in his own deposition he stopped attending team meetings despite Stanton's imposition of the condition.[2]

In mid-April 1993, Papa complained to Director Kavasmaneck and Union Carbide Human Resources Administrator Donna Goebel about age discrimination against him. Goebel initiated an investigation. After reviewing Papa's performance ratings and speaking with Director Kavasmaneck and Supervisor Miller, Goebel concluded there was no evidence to support Papa's claim. Papa testified he approached Goebel in early 1995 and said, "Tell Percy unless I'm promoted soon, I'm going to do something about it." Papa Dep. at 120–21, Def.'s Mem. Supp. Ex. 9. Papa filed a charge with the EEOC on June 2, 1995, which was dismissed in October of that year.

Also in April 1993, Papa sought a transfer out of the Oxo group. Papa contacted Brian Keen, the Technology Manager responsible for glycol ethers and acetone derivatives,

---

**2.** In light of Papa's own deposition testimony, the Court struggles to understand Papa's assertion in his brief that he "never refused to attend meetings." Pl.'s Mem. Resp. at 10. He admitted in his deposition he skipped a meeting with the team's sponsors. Papa Dep. at 83, Def.'s Mem. Reply Ex. 15. Papa provided three explanations for this. First, he said he did not know when the meeting was to be held because he was not invited to it. *Id.* Then he said he skipped the meeting because he had a conflict and had to attend another meeting. *Id.* Then he said he attended the other meeting because he liked the

other subject better. *Id.* Also in his deposition, when asked if the team continued to meet after February 1993, he replied:

> As far as I know, yes, they continued to meet and the team functioned after I had left the area, and as far as I was concerned, it was effective in early February, and they—You know, I just stopped. I stopped going to all team meetings. Like I said, I was on eight teams, and I stopped going to all team meetings and as far as I was concerned, I was out of the Oxo area.

*Id.* at 88–89.

about assignment to Keen's group. With Keen's support and Director Kavasmaneck's approval, Papa joined Keen's group in June 1993. When Papa inquired about the possibility of a grade 14 promotion, Keen told Papa that because others had found Papa's prior performance insufficient to merit promotion, Papa would need to prove himself worthy of promotion in his new assignment. To this end, Keen said he promised to do all he could to groom Papa for promotion, and assigned Papa to a project ripe with opportunities to make significant commercial contributions. Keen also worked successfully to secure for Papa a prestigious Chairman's Award, given to only a small percentage of Union Carbide employees, in recognition of Papa's work.

Shortly after Papa's transfer, Associate Director Stanton wrote Director Kavasmaneck a letter, dated May 3, 1993, indicating Stanton was withdrawing his support for Papa's promotion. In the letter, Stanton said Papa was "completely ineffective" as leader of the peroxide team, refused to participate in and attend team meetings, and exhibited poor judgment and a lack of professionalism. Stanton Ltr. at 1–2, Pl.'s Mem. Resp. Ex. 10.

Papa's annual performance ranking in Keen's group slipped in 1993 but, when it rose in 1994, Papa was placed on a two-year promotion plan. With Keen's support, Papa eventually received the Grade 14 promotion in March 1996.

On June 2, 1995, Papa filed a charge of unlawful age discrimination with the Equal Employment Opportunity Commission. The EEOC determined there was no reasonable cause to believe Union Carbide intentionally discriminated against Papa because of his age by failing to promote Papa earlier than it did. Papa then instituted this civil action within the time allowed by statute, alleging violations of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.* and the West Virginia Human Rights Act, *W. Va.Code* § 5–11–1 *et seq.*

## II. SUMMARY JUDGMENT STANDARD

The Court of Appeals has stated the standard used to determine whether a motion for summary judgment should be granted or denied as follows:

> A moving party is entitled to summary judgment "if the pleading, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.Pro. 56(c). *See Charbonnages de France v. Smith,* 597 F.2d 406 (4th Cir.1979).

> A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party. *Id.* at 255, 106 S.Ct. at 2514. The plaintiff is entitled to have the credibility of all his evidence presumed. *Miller v. Leathers,* 913 F.2d 1085, 1087 (4th Cir.1990), *cert. denied,* 498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991). The party seeking summary judgment has the initial burden to show absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). The opposing party must demonstrate that a triable issue of fact exists; he may not rest upon mere allegations or denials. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. A mere scintilla of evidence supporting the case is insufficient. *Id.*

*Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir.), *cert. denied,* 513 U.S. 813, 814, 115 S.Ct. 67, 68, 130 L.Ed.2d 24 (1994).

## III. AGE DISCRIMINATION

An employee can prove an ADEA violation in either of two ways:

> (1) under ordinary principles of proof using any direct or indirect evidence relevant to and sufficiently probative of the issue, or (2) under a judicially created proof scheme originally used in the Title VII context in *McDonnell Douglas Corp. v.*

*Green* ... and subsequently adapted for use in ADEA cases. *Tuck v. Henkel Corp.,* 973 F.2d 371, 374–75 (4th Cir.1992) (citing, *inter alia, McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), *cert. denied,* 507 U.S. 918, 113 S.Ct. 1276, 122 L.Ed.2d 671 (1993))[ ].

*Burns v. AAF–McQuay Inc.,* 96 F.3d 728, 731 (4th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1247, 137 L.Ed.2d 329 (1997); *see also McDonald v. Cabot Corp.,* 914 F.Supp. 1356, 1359 (S.D.W.Va.1996) (Haden, C.J.).

### A. Burden shifting

■ The *McDonnell Douglas* proof scheme involves three stages. First, a plaintiff must establish a prima facie case of unlawful discrimination. *Burns,* 96 F.3d at 731 (citing *Tuck,* 973 F.2d at 375). Doing so creates a presumption that the employer unlawfully discriminated against the employee. *Id.* Second, the employer may rebut the presumption by articulating a legitimate, nondiscriminatory motive for the adverse employment decision. *Id.* At the third stage, the plaintiff must demonstrate by a preponderance of the evidence that "as between the plaintiff's age and the defendant's explanation, age was the more likely reason for dismissal, or that the employer's proffered explanation is simply unworthy of credence." *Id.; see also Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981); *EEOC v. Western Elec. Co., Inc.,* 713 F.2d 1011, 1014 (4th Cir.1983). Plaintiff bears the burden of persuasion throughout. *Burns,* 96 F.3d at 731 (citing *Tuck,* 973 F.2d at 375).

### 1. Prima facie case of age discrimination

■ To establish a prima facie case of disparate treatment, Papa must establish by a preponderance of the evidence that (1) he is a member of the protected class (over 40 years of age), (2) his employer had an open position for which he applied or sought to apply, (3) he was qualified for the position, and (4) he was rejected for the position under circumstances giving rise to an inference of unlawful discrimination. *Evans v. Tech-*

*nologies Applications & Service Co.,* 80 F.3d 954, 959–60 (4th Cir.1996) (citing *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093; *Carter v. Ball,* 33 F.3d 450, 458 (4th Cir.1994); *McNairn v. Sullivan,* 929 F.2d 974, 977 (4th Cir.1991)).

Union Carbide strongly disputes the third prong of the prima facie case—that Papa was qualified to receive the promotion. In a recent Title VII failure to promote case, the Court of Appeals observed that establishing a prima facie case is "not onerous" and "relatively easy." *Evans,* 80 F.3d at 960 (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093; *Young v. Lehman,* 748 F.2d 194, 197 (4th Cir.), *cert. denied,* 471 U.S. 1061, 105 S.Ct. 2126, 85 L.Ed.2d 489 (1985)). The Court in *Evans* concluded with little discussion that the plaintiff there met her burden and addressed her employer's lack of qualifications argument in the second stage of the *McDonnell Douglas* scheme. *But see O'Connor v. Consolidated Coin Caterers Corp.,* 56 F.3d 542, 548 (4th Cir.1995)(disposing of ADEA reduction-in-force claim in prima facie stage for, among other things, plaintiff's failure to perform at sufficient level), *rev'd on other grounds,* —— U.S. ——, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996). Taking the cue from *Evans,* the Court finds Papa has carried his stage one burden and established a prima facie case.

### 2. Legitimate, nondiscriminatory reason for failure to promote

■ Union Carbide has offered substantial evidence supporting its contention Papa was not qualified to receive the grade 14 promotion prior to 1996. Much of its evidence concerns Papa's conduct at a September 1992 team meeting. In his deposition testimony, Papa's supervisor, David Miller, recounted disagreements Papa had with other members of the team. Miller described Papa's conduct at one team meeting as follows: "[Papa] abandoned leadership of the team.... He sat in the corner of the room, holding his notebooks and records on his lap, away from the table, entered into no discussion, and I ended up having to help lead the team, because the team was without a leader at that

time, or an effective leader." Miller Dep. at 16, Pl.'s Mem. Resp. Ex. 7.

Miller's testimony is corroborated by the affidavits and deposition testimony of Robert Harfmann, Donald Weintritt, George Phillips and Jean Algate, all of whom have characterized Papa's behavior at certain peroxide team meetings as unprofessional. For example, in an uncontradicted affidavit, George Phillips related that at one meeting, Papa "got upset and withdrew from the team's discussion after the other team members began to disagree with certain conclusions that he had drawn.... Mr. Papa ceased to participate in that meeting, and he might have even left while the meeting was still in progress." Phillips Aff. at 1, Def.'s Mem. Reply Ex. 4. Jean Algate in her affidavit said Papa left a meeting after arguing with other team members and did not return. At another meeting, she says Papa "sat away from the table and ... did not actively participate in the discussions of the team." Algate Aff. at 2, Def.'s Mem. Reply Ex. 1. Taken together, the four affidavits describe inappropriate and unprofessional behavior.

Union Carbide has also offered evidence Papa was not as qualified as those promoted ahead of him because the peers with whom he was compared had achieved greater professional success than did Papa. The Court has carefully reviewed the parties' contentions on this point and finds compelling Union Carbide's argument that Papa's reputed peers are better qualified than Papa. However, given the strength of the other evidence marshalled by Union Carbide, the Court concludes the primary reason for denying Papa's promotion was not that other scientists were better qualified, but that Papa performed poorly as leader of the peroxide team.[3] Because the Court finds below this reason is legitimate, nondiscriminatory, and sufficient by itself to deny the promotion, it need not resolve further the peer comparison issues.[4]

3. Apparently, Union Carbide agrees. *See* Def.'s Mem. Supp. at 8 ("Quite simply, Papa's behavior on the peroxide team took him out of the class of persons who would be considered for a Grade 14 promotion.")

4. Additionally, the Court notes the observations of the Court of Appeals that examining a small

### 3. Papa's demonstration of pretext

■ The bulk of Papa's argument centers on demonstrating Union Carbide's proffered reasons for denying the promotion are pretextual. Because "the employer has discretion to choose among equally qualified candidates provided the decision is not based upon unlawful criteria," Papa must in the third *McDonnell Douglas* stage present proof that Union Carbide's explanation is pretextual, that he was the victim of intentional discrimination, and that he was the better qualified candidate for the promotion sought. *Evans*, 80 F.3d at 960 (cited authority omitted).

#### i. David Miller's testimony

Papa argues there are several indications Union Carbide's reasons for failing to promote him are pretextual. First, Papa contests that Supervisor David Miller ever witnessed the conduct he said in his deposition testimony he saw at peroxide team meetings. In support, Papa has produced documents indicating the only team meeting Miller attended with Papa during that time period was in September 1992. Because Miller supported Papa's promotion as late as December 1992, Papa's argument goes, Miller must have fabricated his testimony about Papa's behavior as team leader because Miller would not have supported Papa's promotion after observing such conduct. Union Carbide responds by noting that while Miller originally testified he did not believe he witnessed the behavior at the September 1992 meeting, he stated on the errata sheet to his deposition transcript he was "not sure it was the [September] meeting, but [he] think[s] it was." Miller Aff. at 105, Def.'s Mem. Reply Ex. 14. Papa did not discuss this specific testimony in his response brief. Instead, Papa cites deposition testimony of Robert Harfmann, a member of the peroxide team, that, in apparent contradiction to Miller's

pool of employees—in this case five arguably—is not probative of discrimination. *O'Connor*, 56 F.3d at 548 (citing, *inter alia*, *Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 511 (4th Cir.), *cert. denied*, 513 U.S. 1058, 115 S.Ct. 666, 130 L.Ed.2d 600 (1994)).

testimony, Harfmann had "no specific recollection of [Papa] actually sitting in a corner" at a peroxide team meeting. Harfmann Dep. at 15, Pl.'s Mem. Resp. Ex. 8. This inconsistency is insignificant and is too thin a reed to establish a genuine issue on this point. The important testimony is not that Papa actually "sat in a corner" at a team meeting, but rather, as Miller testified, and as Harfmann, Weintritt, Phillips and Algate corroborated, that Papa acted unprofessionally and did not lead the team as required.

Papa's broadsides on Miller's testimony are further weakened by the fact that Miller, accused by Papa of harboring a discriminatory animus against Papa on account of Papa's age, championed Papa's promotion in 1991 and 1992. In the Fourth Circuit, Miller's early support of Papa's promotion creates a strong inference that Miller lacked such animus. *See Tyndall v. National Educ. Ctrs.,* 31 F.3d 209, 214–15 (4th Cir.1994) (in ADA case, observing "[w]hen the hirer and firer are the same individual, there is a powerful inference ... that discrimination did not motivate the employer[.]")(citing *Proud v. Stone,* 945 F.2d 796, 798 (4th Cir.1991)) (same rule applied to ADEA case); *see also Evans,* 80 F.3d at 958; *Mitchell v. Data Gen. Corp.,* 12 F.3d 1310, 1318 (4th Cir.1993).

Additionally, Papa has not challenged Miller's testimony that he had five to ten discussions with Papa in which Miller reminded Papa of his obligations to lead the team. Likewise, Papa does not contest David Bryant's testimony that he "discussed the situation with [Papa], pointing out the importance of participating, not simply attending, but participating as a strong leader, because if he failed to attend, if he didn't participate, it could sabotage a great deal of effort that I put into grooming him for promotion." Bryant Dep. at 55–56, Def.'s Mem. Supp. Ex. 3.

#### ii. Written performance evaluations

Papa also notes the absence of reference to this unprofessional behavior on his written performance evaluations for the relevant time period and further points to the absence of any written performance evaluations for the first quarter of 1993. Because Papa was transferred to Keen's group in May 1993, Keen was responsible for submitting the evaluation. In his Response, Papa did not address Keen's explanation for not evaluating Papa's early 1993 performance: "I'm not interested in the past; I'm interested in the future. I saw Tony as being a good employee, and I was interested in being supportive to Tony Papa from here on out. I didn't see it to be productive to be concerned about the past, because I can't do anything about the past. It's not my responsibility to." Keen Dep. at 35, Def.'s Mem. Reply Ex. 13. In any event, Papa has provided no evidence Keen's failure to provide a written performance evaluation is pretext for discrimination.

#### iii. Stanton's letter

Papa also notes Associate Director Stanton wrote the letter to Director Kavasmaneck withdrawing support for Papa's promotion and documenting Papa's unprofessional behavior three months after the behavior occurred. Papa has presented no evidence to contest Stanton's explanation that he wrote the letter when he did because Stanton was about to retire at that time. According to Stanton, since he had previously supported Papa's promotion, Stanton wanted to clarify the record that he was withdrawing his support. Moreover, in light of the inferences described in the *Tyndall* and *Proud* cases discussed *infra,* "it simply makes no sense whatsoever that Stanton would recommend Papa for promotion in December 1992, only to decide five months later not to support Papa because of his age and, therefore, make up a lie to support his withdrawal of support." Def.'s Mem. Reply at 8.

#### iv. Age-related remarks

Papa also seeks to establish pretext by arguing age was a specific factor in the promotion of one of the younger scientists promoted ahead of Papa. Papa cites three documents relating to the promotion of John Argyropoulous which describe Argyropoulous variously as a "bright young scientist," "productive young scientist[ ]," and "enterprising young scientist[ ]." See Pl.'s Mem. Resp. Ex. 11. These comments are innocuous, not probative of age discrimination, and are better understood as mere commentary on the fact

that Argyropoulous is, in fact, young. Papa has presented no evidence to support the inference that the comments about Argyropoulous' age were motivated by an intent to discriminate on the basis of age or connected to the decision not to promote Papa. *See, e.g., EEOC v. Clay Printing Co.,* 955 F.2d 936, 942 (4th Cir.1992)(stating comments that employer needed to "attract newer, younger people" and "young blood" are not probative of age discrimination or discriminatory purpose); *Merrick v. Farmers Ins. Group,* 892 F.2d 1434, 1438–39 (9th Cir.1990)(a decision-maker's statement that he promoted a " 'bright, intelligent knowledgeable young man' " instead of the plaintiff is insufficient to raise triable issue regarding pretext). The same is true for alleged statements by Papa's supervisor, David Miller. Papa says Miller suggested to Papa he consider retirement in light of Papa's age and recent bout with cancer.

Considering these and Papa's remaining arguments, the Court finds and concludes Papa has failed to summon enough evidence under the *McDonnell Douglas* proof scheme to defeat summary judgment. A fair minded jury could not return a verdict for Papa on the evidence he has presented. *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512; *Clay Printing Co.,* 955 F.2d at 942–43.

## IV.  DIRECT EVIDENCE

■ As stated *infra* Part III, an ADEA plaintiff can establish a claim under either the *McDonnell Douglas* paradigm or by "provid[ing] direct evidence of a purpose to discriminate or circumstantial evidence of sufficiently probative force to raise a genuine issue of material fact." *Evans,* 80 F.3d at 959 (citing *Goldberg v. B. Green & Co.,* 836 F.2d 845, 848 (4th Cir.1988)); *O'Connor* 56 F.3d at 548. The only such evidence Papa has offered concerns comments he alleges were made by Bryan Keen, under whom Papa worked beginning May 1993. Papa avers Keen "explicitly agreed with Papa's assertion that Papa had not been promoted because Union Carbide was 'practicing age discrimination.'" Papa Dep. at 117–18, Pl.'s Mem. Resp. Ex. 2. Keen has denied this. Papa's account of the conversation does not bear out his counsel's assertion that Keen "explicitly agreed" with Papa:

A. [Papa] [W]hen I says that, "the Company is practicing age discrimination," he went, "Yeah."

Q. What else did he say? Is that a direct quotation of what was said, as best you remember?

A. Yes, he shook his head yes (indicating).

Q. Nodded his head?

A. Nodded his head and said yes.

. . . .

Q. Did he say anything else?

A. I don't remember him saying anything else, no.

*Id.* at 114.

Taken as true, the conversation with Keen reveals only an isolated and ambiguous statement that is "too abstract, in addition to being irrelevant and prejudicial, to support a finding of age discrimination." *O'Connor,* 56 F.3d at 549 (internal quotation marks and cited authority omitted). Also, as Union Carbide has observed, the alleged utterance is merely Keen's opinion of the motivation of the persons who made the decision not to promote Papa. Keen himself championed Papa's promotion and initiated the promotion proposal on Papa's behalf. Relatedly, because Keen played no role in the decision not to promote Papa, there is no nexus between Keen's alleged statements and the decision not to promote Papa. *See O'Connor,* 56 F.3d at 548; *Clay Printing Co.,* 955 F.2d at 942. Without this nexus, Keen's statement evinced no discriminatory intent. *See O'Connor,* 56 F.3d at 549.

## V.  RETALIATION CLAIMS

■ Papa also alleges Union Carbide did not promote him to grade 14 until March 1996 in violation of the ADEA's anti-retaliation provision, 29 U.S.C. § 623(d). Specifically, he contends Union Carbide retaliated against him because he complained to management about age discrimination. To establish a claim of retaliation, Papa must demonstrate (1) he engaged in protected activity; (2) Union Carbide took adverse action against him, and (3) there is a causal connec-

tion between the protected activity and the retaliation. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir.1985), *abrogated on other grounds by Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989).

It is common ground between the parties that Papa has satisfied the first two elements. Papa contends the "most compelling" evidence of causal connection is that Associate Director Stanton wrote his May 3, 1993 letter withdrawing support for Papa's promotion, discussed *infra*, fewer than ten days after Papa first complained to Goebel. Papa has no evidence to refute Stanton's statement that, at the time he wrote the letter, he had no knowledge that Papa had complained to Goebel of age discrimination. Nor has Papa controverted the affidavits of the three persons who knew of Papa's complaint, Kavasmaneck, Miller, and Goebel, that they did not tell Stanton of the complaint. No juror could reasonably infer that, absent knowledge of Papa's complaint, Stanton retaliated against Papa for complaining.

The Court has considered Papa's remaining arguments supporting his retaliation claim and concludes none is sufficient to defeat summary judgment.

## VI. HUMAN RIGHTS ACT CLAIMS

Both West Virginia courts and federal courts applying West Virginia law consistently follow the analytical framework that governs Title VII and the ADEA. *Barefoot v. Sundale Nursing Home*, 193 W.Va. 475, 482–83, 457 S.E.2d 152, 159 (1995)(interpretation of West Virginia Human Rights Act tracks federal law unless Act directs otherwise); *Shafer v. Preston Memorial Hosp. Corp.*, 107 F.3d 274, 281 (4th Cir.1997)(following federal law in interpreting Human Rights Act). Just as the Court has concluded Papa's claims fail under the ADEA, his claims likewise fail under the Human Rights Act.

## VII. CONCLUSION

For the foregoing reasons, the Court finds and concludes Papa has not raised a genuine issue of fact, and Union Carbide is entitled to judgment as a matter of law. Accordingly, the Court **GRANTS** Union Carbide's motion for summary judgment and directs the Clerk to dismiss the case from the docket.

The Clerk is directed to send a copy of this Memorandum Opinion and Order to counsel of record.