UNPUBLISHED

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

RICHARD C. MASON,
Plaintiff-Appellant,

v.

BALTIMORE GAS AND ELECTRIC

No. 98-1834

COMPANY; CHRISTIAN H. POINDEXTER,
Chairman and Chief Executive
Officer of Baltimore Gas & Electric
Company,
Defendants-Appellees.

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Marvin J. Garbis, District Judge.
(CA-95-2002-MJG)

Argued: April 7, 1999

Decided: June 29, 1999

Before ERVIN, LUTTIG, and TRAXLER, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Janet A. Vecchia, VECCHIA & WOLFER, Washington,
D.C., for Appellant. Laurie Richman Bortz, Baltimore, Maryland, for
Appellees. **ON BRIEF:** Judith A. Wolfer, VECCHIA & WOLFER,
Washington, D.C., for Appellant. Ronald D. Byrd, Baltimore, Mary-
land, for Appellees.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Richard C. Mason ("Mason") brought this civil action against his former employer Baltimore Gas & Electric Co. ("Baltimore Gas"), alleging discrimination under the Age Discrimination in Employment Act ("ADEA"), see 29 U.S.C.A. § 621-634 (West 1985), fraud, negligent misrepresentation, and breach of contract. In his civil action, Mason challenged Baltimore Gas' decision to displace him pursuant to its 1993 reduction in force ("RIF" or "reorganization"). On May 12, 1998, the district court issued its decision granting summary judgment to Baltimore Gas on all counts. Mason appeals. Finding no error, we affirm.

I.

Mason began his career with Baltimore Gas as an"office boy" in 1961. Throughout his 32-year tenure with Baltimore Gas, Mason served in a variety of capacities, and was promoted on at least five occasions.[1] However, in 1984 Mason agreed to a salary decrease and took a new position as a grade 15 Lead Special Investigator[2] in the Customer Relations Department. In this position, he assigned work to the Special Investigators, reviewed their work, prepared observation reports, and coordinated sick and vacation time.

_____

[1] Mason was promoted to the position of Customer Representative in 1967; Senior Customer Representative in 1971; Principal Customer Representative in 1974; Special Investigator in 1976; and Supervisor, Customer Service Board in 1982. All of these positions were in Baltimore Gas' Customer Relations Department.

[2] The Lead Special Investigator position was the position at Baltimore Gas which Mason coveted most, despite the lower salary. Speaking of the Lead Special Investigator position specifically, Mason commented as follows: "It was a job that I wanted. Forget the numbers. Forget the salary."

2

Late in 1990, Mason's supervisor at the time, Charles E. Linn, Jr. ("Linn"), advised him that Baltimore Gas was going to eliminate the Lead Special Investigator position and that Mason needed to seek a new position within the Customer Relations Department. Subsequently, Mason applied for the positions of Supervisor of the Energy Analysis Unit, Training Coordinator, and his previous position of Supervisor of the Customer Service Board. Mason, however, was not selected for any of these positions.

Sometime between January 1, 1991 and April 1, 1991, Mason -- at the request of Jim Soukup ("Soukup") of the Employee Services Department -- reluctantly agreed to accept the position of grade 14 Special Investigator in the Customer Relations Department. Mason then signed a "Salary Protection Notice" providing his written acceptance of the Special Investigator position and the salary protection offered along therewith. Thus, on April 1, 1991, Mason's title officially became Special Investigator under the Supervision of Dennis Gibson ("Gibson"). Mason described his duties under Gibson as follows:

> I was dealing with customers instead of employees. I was working cases, resolving customer complaints and problems, billing problems, and I wasn't observing cases. I wasn't dealing with customer appeals. I wasn't providing information for appraisals. I wasn't scheduling vacations. I wasn't doing all of the administrative stuff that a lead person does.

As Mason acknowledged, his duties as a Special Investigator were of a different nature than those he performed as a Lead Special Investigator. And Baltimore Gas' employee organization charts confirm that -- at least from May 1, 1991 through April 1, 1992 -- there were no Lead Special Investigator positions anywhere in the Customer Relations Department.

In October 1991, Mason received a call from Gibson, who stated his belief that Baltimore Gas had not treated Mason fairly in 1990. Gibson then asked Mason to fill the opening created by the recent departure of Don Copenhaver ("Copenhaver"). At the time of his

3

departure, Copenhaver had been performing the functions of a "lead person," although his official title was Special Investigator.

When Mason took Copenhaver's Special Investigator position he described himself as "back [to] leading people, distributing work, giving the work out, doing observations of [other Special Investigators'] work, submitting those observations to [ ] Gibson, scheduling vacations, . . . taking time reports, doing payroll[and] . . . taking appeals." Mason candidly acknowledged, however, that members of Baltimore Gas' "top management" thought the [Lead Special Investigator] jobs weren't being done anymore . . . ." He also acknowledged that he remained a Special Investigator "on paper." Furthermore, Gibson confirmed that although he thought the Lead Special Investigator position "should have never been eliminated," Mason came to work for him merely as a "Special [I]nvestigator."

Nevertheless, regarding the functions once performed by Lead Special Investigators, Gibson observed, "you're going to have to do it; you're going to have to determine how; you're going to have to get somebody to do it. And the logical choice was . . . one of the [S]pecial [I]nvestigators because of their background."

On August 18, 1993, all Baltimore Gas managers attended a meeting[3] where senior management announced that it was going to reduce operating and maintenance costs by approximately $46 million.[4] As a result, every department, section, and unit within the company was

_____

[3] During this meeting, senior management distributed Baltimore Gas' "Guidelines Concerning Employee Displacement," which, inter alia, expressly forbade displacement "based on age, race, sex, disability, or other unlawful factors."

[4] In its Memorandum in Support of Motion for Summary Judgment, Baltimore Gas explained that this reduction was necessary because: "In 1988 Baltimore Gas had the lowest electric rates in the Pennsylvania-New Jersey-Maryland Interconnection Region, and in 1993 Baltimore Gas was in the middle third in cost comparisons; high costs made Baltimore Gas vulnerable to losing customers to neighboring utilities and non-utility generators; [and] in 1993 7-1/2 percent of 1992's revenues were at risk to non-utility generators who were courting Baltimore Gas' customers."

directed to review its personnel and operating costs to determine what reductions could be made. Accordingly, senior management officials directed all Baltimore Gas managers to identify"functions and positions that could be eliminated without sacrificing performance in critical areas."

In furtherance of this goal, the Manager of the Customer Relations Department, Kenneth W. Defontes ("Defontes"), and the Manager of the Customer Accounts Department, Gregory Martin ("Martin") decided to consolidate the two departments into one department called the Customer Service Department. Gibson viewed an "organizational chart" for the proposed Customer Service Department and noted that it contained no provision for any Lead Special Investigator positions. He thus informed Mason in September or October 1993 that a Lead Special Investigator position would not exist.[5] Mason acknowledged that Gibson's statements were not made"formally," but were merely meant to give him some "advance notice of where [Gibson] thought things were headed."

In October 1993, while the Managers and General Supervisors were working out the logistics of the merger, Martin directed the Supervisors in each department to rank every employee in their respective position, from best to worst performer. As a part of this process, Linn -- now the Supervisor of the Special Investigations Unit of the Investigations Section -- and Gibson were directed to rank the 22 Special Investigators who worked in their two units. Unbeknownst to Mason, Gibson and Linn conducted this ranking in October 1993 and ranked Mason number 16 out of the list of 22 Special Investigators, despite the fact that he performed additional functions as a Special Investigator. Once the rankings were complete, Gibson and Linn turned them over to Martin for review.

Shortly thereafter, Martin, Gibson and Linn concluded that the new Customer Service Department would need only seven Special Investigators and that an additional eight Special Investigators would be sent to other departments. Therefore, it was determined that only 15 of the 22 Special Investigators were needed and that the seven lowest ranked

_____

[5] Notably, Mason remained listed as merely a Special Investigator on the Customer Relations Department's organizational chart.

5

Special Investigators would be "tentatively" displaced. In November 1993, Mason, then age 50, was "officially" informed by Gibson -- his supervisor at the time -- that he was "tentatively" displaced, i.e., Baltimore Gas was eliminating his position and his responsibilities would be assumed by the other remaining Special Investigators in the newly organized and renamed department.

On or about November 15, 1993, Baltimore Gas presented Mason with four severance options offered to all displaced employees: (1) job termination with no severance benefits; (2) a severance pay equivalent to 65 weeks of pay; (3) paid participation in an internal job relocation assistance program for a maximum of 52 weeks with no guarantee of job placement at a comparable salary; and (4) election to take early retirement as if he had retired at age 55 with a $400 per month Social Security bridge until Social Security benefits actually began. Mason had until December 15, 1993 to exercise the early retirement option at which time such election became irrevocable.

On November 30, 1993, Mason chose what he thought was the "least damaging option," the early retirement plan. Baltimore Gas acknowledged, in writing, that Mason had selected early retirement on December 4, 1993.**6**

After the election period ended on December 15, 1993, Baltimore Gas determined that many of its most experienced Special Investigators -- including those ranked ahead of Mason-- had also elected the early retirement option; and as a result of the RIF, Baltimore Gas discovered it could not operate effectively after the retirement of so many experienced workers. Therefore, a new reorganization was approved and enacted in January 1994. Under the new 1994 reorganization, the two departments still merged under one general supervisor, but the net result was that the January 1994 reorganization looked similar to the department's organization prior to the 1993 RIF.

Most relevant to the present case, Baltimore Gas created two new Lead Special Investigator positions with functions similar to those performed by Mason in 1991. The new Lead Special Investigators

─────────────────────────────────────────────────────────

**6** Mason's retirement became effective January 31, 1994.

were to assume the supervisory functions within the new department. Between January 1994 and March 1994, Baltimore Gas promoted and trained 37-year-old Edward Woolford to be one of the Lead Special Investigators in charge of supervising the employees and performing responsibilities comparable to those performed by Mason before his displacement.

On July 7, 1995, Mason filed a discrimination action under the ADEA. Mason later amended his complaint to include state law claims of fraud, negligent misrepresentation and breach of contract. On May 12, 1998, the district court granted summary judgment in favor of Baltimore Gas.

On appeal, Mason challenges the district court's ruling with respect to his claim under the ADEA. More specifically, Mason claims that Baltimore Gas' 1993 RIF was a pretext for his age-based displacement. In that regard, he alleges that Baltimore Gas' age-based animus towards him is confirmed by (1) his ranking as a Special Investigator rather than a Lead Special Investigator; (2) Gibson's pre-ranking statements to him that his position was being eliminated; (3) statistical evidence highlighting the overall impact of the 1993 RIF on older employees; and (4) Baltimore Gas' return to the 1993 pre-RIF organization shortly after his retirement.

II.

Absent direct evidence of discrimination, Mason must satisfy the three-step proof scheme established by McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973). First, Mason must establish, by a preponderance of the evidence, a prima facie case of discrimination. Once established, the burden shifts to Baltimore Gas to "rebut the presumption of discrimination by producing evidence that [Mason] was rejected . . . for a legitimate, nondiscriminatory reason." Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981). If Baltimore Gas meets its burden of production, the presumption raised by the prima facie case is rebutted and "drops from the case," id. at 255 n.10, and Mason bears the ultimate burden of proving that he has been the victim of intentional discrimination, see St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-11 (1993).

7

For purposes of this appeal, we will assume, as the district court found, that Mason has made out a prima facie case of age discrimination, and that Baltimore Gas responded by articulating a legitimate nondiscriminatory reason for Mason's discharge. Thus, Mason bears the ultimate burden of proving that age was a determinative factor in the adverse employment decision. See Vaughan v. MetraHealth Companies, Inc., 145 F.3d 197, 202 (4th Cir. 1998). Mason can meet this burden only by showing both that Baltimore Gas' proffered reason for eliminating his position was false and that discrimination was the real reason for its actions. See id. With this framework in mind, we address Mason's claims in turn.

A.

We begin by examining Mason's claim that Baltimore Gas ranked him as a Special Investigator merely as a pretext to conceal discrimination based on his advanced years. Mason contends that his job was marked for elimination before the ranking was done. He notes that the district court was required to view the evidence in the light most favorable to him and argues that his evidence, when so viewed, would have precluded the district court from granting summary judgment in favor of Baltimore Gas. Specifically, Mason contends that the district court ignored testimony suggesting that he should have been ranked as a Lead Special Investigator rather than a Special Investigator, and was too dismissive of Gibson's comments -- allegedly made prior to the rankings -- concerning the elimination of his position.

We cannot agree. When viewed in its entirety, this case is plainly not one of age-based animus aimed at Mason. We agree with the district court that there is no significant evidence that Mason's ranking as a Special Investigator was a mere pretext for his displacement.

1.

It is undisputed that at the time he voluntarily severed his relationship with Baltimore Gas, Mason's official job title was that of Special Investigator. However, despite the fact that Mason remained a Special Investigator in title and on the Customer Relations Department's organizational chart, Gibson accommodated Mason's request not to do the "boring" casework associated with Special Investigator status,

8

and allowed him instead to perform the less perfunctory tasks that Lead Special Investigators formerly performed. Mason now requests that we extrapolate from such acquiescence a finding that Mason should have been ranked as a Lead Special Investigator rather than a Special Investigator. We are not persuaded.

As Mason was aware, Baltimore Gas eliminated the Lead Special Investigator position in late 1990. At that time, Mason recalls, Linn informed Mason that Baltimore Gas was "going to eliminate [his] job; somebody is going to -- your job is going on paper; there is no more [Lead Special Investigator position] . . . ." Shortly thereafter, Mason signed a salary protection notice wherein he pronounced that "I, Richard C. Mason, employee #23765, understand that I am being placed in the job of Special Investigator in the Customer Relations Department, effective, 4/1/91 as a result of Reorganization . . . etc.)."

From the point of the 1991 Reorganization up until his ranking and departure in 1993, Mason's status was that of Special Investigator. Although Gibson allowed Mason to perform functions formerly associated with the Lead Special Investigator position, which unquestionably heightened his morale, Mason's work did not-- for ranking purposes -- alter his status as a Special Investigator. Indeed, both Gibson and Linn maintained that Mason had to be ranked as a Special Investigator because that was his official title, despite the supervisory functions he performed. Notably, another Special Investigator, Merle Greenwalt, who, like Mason, was performing supervisory functions, was also ranked as a Special Investigator.

Even if, as Mason contends, there had been some"unfairness" in ranking him as a Special Investigator since he performed supervisory functions, there is nothing to indicate age-based unfairness. We deem such a flaw fatal in the context of ADEA claims, where "[t]he question before us is a straightforward one -- whether[Mason] successfully demonstrated that [he was] the victim[ ] of age discrimination on the part of [Baltimore Gas]." Birkbeck v. Marvel Lighting Corp., 30 F.3d 507, 511 (4th Cir. 1994).

At the outset, we note that the Baltimore Gas "Guidelines Concerning Employee Displacement" ("Guidelines") expressly prohibited age-based discrimination:

9

When evaluating under the former monthly or current weekly systems: consistent "A" performers retained and "C" performers displaced; consistent "B" performers considered on a case-by-case basis; other factors to consider include skills applicable in restructured department and record of effort to improve or increase pertinent job skills.

....

After review, manager ranks employees by their record. Work force diversity considered, when contributions equal. Process must not discriminate based on age, race, sex, disability or other unlawful factors.

....

Positions filled with "best-qualified" employees.

Although Mason was well-regarded, he was only a"B" performer at Baltimore Gas from December 1, 1984 through December 1, 1992, with the exception of a single year. Thus, according to the Guidelines, Mason's continued employment with Baltimore Gas was not guaranteed, but was subject to Baltimore Gas' age-neutral analysis on a "case-by-case basis."

After reviewing the evidence, we are convinced that Baltimore Gas' ranking of Special Investigators, including Mason, constituted an age-neutral and case-by-case analysis of Baltimore Gas' employees as provided for by the Guidelines. Baltimore Gas used a ranking system based on a list of ten criteria essential in performing the overall duties associated with the various work assignments of Special Investigators. These criteria -- developed by Gibson and Linn -- included job knowledge, judgment and analysis, administrative skills, initiative, flexibility, writing skills, self-confidence, corporate mindedness, willingness to follow rules, and interpersonal skills. Employing these criteria, Gibson and Linn ranked Mason 16 out of the 22 Special Investigators.

Thereafter, Gibson and Linn, along with Martin -- a Baltimore Gas official who was not involved in the rankings -- determined that only

10

15 out of the 22 Special Investigators would be needed under the reorganization. Thus, Mason's ranking put him outside the number of employees identified for retention.

Collectively viewed, the evidence demonstrates that age was not considered during the ranking process and that Baltimore Gas used a merit-based and age-neutral system when determining the best manner in which to reduce its workforce. Mason has not produced any evidence that age-based animus was the cause for his low ranking. And, Baltimore Gas has "produce[d] significant evidence that it provides an environment that is receptive to older workers." Dockins v. Benchmark Communications, ___ F.3d ___, 1999 WL 292103, at *4 (4th Cir. Mar. 29, 1999). Foremost is the fact that all 22 of the Special Investigators ranked by Baltimore Gas were within the protected class, i.e., over 40 years of age. Moreover, 6 out of the 15 Special Investigators who were ranked higher than Mason were older than he, one -- Charles Armstrong -- by over ten years. Indeed, "[t]he character of [Baltimore Gas'] workforce, both before and after [Mason's] termination, `suggests anything but a youth movement at [Baltimore Gas].'" Id. (quoting EEOC v. Clay Printing Co., 955 F.2d 936, 941 (4th Cir. 1992)).

2.

Mason does not dispute the fact that Baltimore Gas employed an overwhelming number of Special Investigators who were advanced in years according to the standard established under the ADEA. Instead, Mason focuses on evidence which according to him suggests that his position was eliminated "prior to" the Special Investigator rankings. Plainly stated, Mason alleges that if Baltimore Gas had already made the decision to eliminate his position prior to the rankings, then the rankings were a mere ruse to disguise its age-based discrimination against him. We are unconvinced that Mason has tied his allegation to any age bias on the part of Baltimore Gas.

In support of his ranking theory, Mason directs the court's attention to Gibson's statement to him prior to the rankings that there would be no Lead Special Investigator position after the RIF. As previously discussed, however, Mason was aware that the Lead Special Investigator position at Baltimore Gas had long been extinguished by virtue

11

of the earlier 1990 restructuring, although Mason, up until his 1993 retirement, had been performing tasks traditionally associated with that office. Thus, Gibson's statement to Mason could have conveyed no more than the fact that Baltimore Gas had decided not to reinstate the Lead Special Investigator position through the RIF.

Nevertheless, Mason acknowledged that Gibson's unofficial and informal statement, made in September 1993, was merely giving him some "advance notice of where [Gibson] thought things were headed." The official notice of Mason's displacement was issued several months later in November 1993. Pursuant thereto, Mason chose early retirement. Mason presents no evidence that Baltimore Gas coerced or even encouraged him (because of his age) to choose early retirement over the other three options.[7] Under these circumstances, we find no evidence that Baltimore Gas surreptitiously charted Mason toward the course of early retirement, or otherwise discriminated against Mason on the basis of his age.

B.

Unable to demonstrate that the ranking of Special Investigators was motivated by his age, Mason attempts to establish age discrimination through statistical evidence. Mason hired Dr. Mark Killingworth ("Dr. Killingworth"), an expert labor economist, to review and analyze Baltimore Gas' computer data to determine whether the employee terminations and job eliminations at Baltimore Gas were attributable to any age-related factor. Based on Dr. Killingworth's analysis of the 1,141 personnel displaced in the 1993 RIF, Mason contends that workers over the age of 40 were much more likely than younger workers to have their jobs eliminated. Indeed, in Dr. Killingworth's opinion, there were highly statistically significant rates of job elimination and job termination of older workers. Mason argues that such statistical evidence establishes that Baltimore Gas' decision to displace him was a pretext for age discrimination.

_____

[7] It is particularly noteworthy that Mason chose not to pursue one option, the "internal job relocation assistance program," which would have kept Mason with Baltimore Gas for at least 52 weeks after his displacement.

12

Considering the record as a whole, we find Mason's statistical evidence insufficient to establish a genuine issue of fact. In so ruling, we reiterate the district court's determination that Dr. Killingworth's analysis was too broad to create any relevant inferences as to the cause of Mason's discharge:

> [I]n order for a statistical comparison of employees to prove pretext, it must analyze the treatment of comparable employees. Since [Baltimore Gas] used performance evaluations to determine which workers to [displace], in order to prevail, [Mason] would have to show that [Baltimore Gas] treated comparably rated employees differently.[In this case, Mason's] statistical analysis ignores the performance evaluations and, therefore, does not prove that[Baltimore Gas'] explanation was pretextual.

Nitschke v. McDonnell Douglas Corp., 68 F.3d 249, 252 (8th Cir. 1995) (internal quotations and citations omitted).

Considering the circumstances of this case, Dr. Killingworth's analysis -- in order to be probative of age discrimination -- needed to be more precise than it was. In conducting his analysis, Dr. Killingworth simply compiled the overall effect of the RIF on over 1,000 displaced employees. However, he failed to account for the major differences in circumstances surrounding the displacement of these employees as compared to that of Mason. Of particular import, all but 21 of these employees worked in different departments than Mason, were subject to different supervision than Mason, and ultimately, were evaluated, retained, or displaced by decision makers other than those in charge of Mason at the time of his retirement. Indeed, the only group analysis that was relevant to Mason's claim concerned the 22-member Special Investigator unit to which Mason formerly belonged. See Birkbeck, 30 F.3d at 511 (limiting statistical analysis to 15-member work group of which plaintiff was a member); see also Marshall v. Westinghouse Elec. Corp., 576 F.2d 588, 592 (5th Cir. 1978) ("[I]n the context of investigating an individual complaint the most natural focus is upon the source of the complained of discrimination -- the employing unit or work unit."). Had Dr. Killingworth conducted an analysis of this group as affected by the RIF, he would not have reasonably been able to conclude that the RIF was intended

13

to promote "a youth movement at [Baltimore Gas]." Clay Printing, 955 F.2d at 941.

In reaching our decision, we are mindful of the general rule that "[s]tatistics with regard to the defendant's employment policy and practice may be helpful to a determination whether its action in a particular case conformed to a general pattern of discrimination." Warren v. Halstead Indus., Inc., 802 F.2d 746, 753 (4th Cir. 1986). But, "statistics cannot alone prove the existence of a pattern or practice of discrimination, or even establish a prima facie case shifting to the employer the burden of rebutting the inference raised by the figures. . . ." Id. In fact, we have held that "careful scrutiny" should be applied to statistical evidence due to its "inherently malleable" nature. Vaughan, 145 F.3d at 203.

After carefully scrutinizing the statistical evidence presented in this case, we determine it best to abandon those statistics conveying the overall effect of the RIF (on over 1,000 displaced employees) in favor of more precise statistical data concerning Special Investigators and the supervisors -- Gibson and Linn -- directly involved in their displacements, including Mason's. See id; see also Birkbeck, 30 F.3d at 511. Indeed, the "broad pronouncement that statistical evidence is `unquestionably relevant' in a Title VII case cannot be read to foreclose the exclusion of evidence with little or no probative value." Carter v. Ball, 33 F.3d 450, 456 (4th Cir. 1994) (discussing use of statistical evidence in context of a Title VII race discrimination claim). Instead, "[t]he usefulness of statistics depends on the surrounding facts and circumstances." Id. at 456. Considering the surrounding facts and circumstances presented in this case, we find that Mason has failed to produce any statistical evidence sufficiently probative for a reasonable jury to infer any age-based discrimination against him on the part of Baltimore Gas.

C.

Next, we address Mason's claim that Baltimore Gas' decision to revise the RIF as it related to the Customer Relations Department constitutes sufficient evidence of pretext under the ADEA. Mason makes much of the fact that soon after his retirement, Baltimore Gas restructured the Customer Relations Department so that it was orga-

14

nized in much the same manner as it had been prior to the RIF. According to Mason, such restructuring proves that Baltimore Gas never legitimately intended to implement the RIF in the Customer Relations Department, but instead, intended only to utilize it as a mechanism for accomplishing Mason's exodus. We disagree.

When Baltimore Gas offered its early retirement plan in November 1993, 100% of the eligible employees in the Customer Relations Department retired (including Mason), leaving the new Customer Service Department with an unexpected shortage of experienced employees. This shortage caused Baltimore Gas to reevaluate its reorganization plan, and to return to an organization similar to its pre-RIF corporate structure.

Thus, Baltimore Gas' decision to revise the reorganization plan was motivated by legitimate economic and business concerns akin (although not identical) to those which prompted the original decision to enact the RIF. Such decisions do not run afoul of the ADEA's prohibitions. In fact, we observed in Birkbeck that "[t]he ADEA was not intended to obstruct the ability of a commercial enterprise to make necessary adjustments in the face of economic challenges." 30 F.3d at 513. As in Birkbeck, Baltimore Gas' RIF (as originally implemented and as revised) reflects business realities-- the need to consolidate and reduce operations to their most efficient level -- not age discrimination.

III.

Finally, we address the several state law claims-- fraud, negligent misrepresentation, and breach of contract -- which Mason raised at the district court level. At the outset, we note that all but one half page of Mason's 39-page Initial Brief and all of Mason's 19-page Reply Brief concern Mason's ADEA claim rather than his state law claims. Moreover, the one half page dedicated to Mason's state law claims of fraud and negligent misrepresentation do nothing more than apprise this court that such claims were dismissed below. And Mason's other state law claim (for breach of contract) has not been briefed at all. Nevertheless, after review we find Mason's state law claims to be without merit.

15

IV.

For the reasons set forth above, we conclude that Mason's claim under the ADEA, as well as his state law claims, fail as a matter of law. Accordingly, we affirm the district court's order granting summary judgment in favor of Baltimore Gas.

AFFIRMED

16